# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 19, 2009        Decided May 25, 2010

No. 06-3128

UNITED STATES OF AMERICA,
APPELLEE

v.

GEORGE WILSON, ALSO KNOWN AS SHUG, ALSO KNOWN AS
HERMAN WALKER, ALSO KNOWN AS DONNELL MACK,
APPELLANT

Consolidated with 06-3131, 06-3133, 06-3136, 06-3140

Appeals from the United States District Court
for the District of Columbia
(No. 04cr00128-18)

*Richard K. Gilbert*, *David B. Smith*, *Steven R. Kiersh*, and *Sicilia C. Englert*, appointed by the court, argued the cause for appellants. With them on the briefs were *Michael E. Lawlor* and *Thomas J. Saunders*, appointed by the court. *Kristen G. Hughes*, appointed by the court, entered an appearance.

*Stratton C. Strand*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Roy W. McLeese*

*III*, *Elizabeth Trosman*, *John Dominguez*, and *Darlene Soltys*, Assistant U.S. Attorneys.

Before: SENTELLE, *Chief Judge*, and ROGERS and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

PER CURIAM:  A group known as the M Street Crew operated a massive drug ring in Northeast Washington, D.C. The Crew sold PCP, as well as ecstasy and some crack cocaine. From late 2002 through March 2004, the government conducted an extensive investigation of the M Street Crew's activities.  As a result of the investigation, 19 defendants were charged with a variety of federal crimes.  In this appeal, five of those defendants challenge their convictions and sentences.  They raise numerous claims, some common to all defendants and others specific to one or more defendants.  Except for one issue related to defendant Blackson's judgment as to which the government concedes error, we affirm the district court's judgments in their entirety.

I

A

We describe the facts in the light most favorable to the government, as we must in reviewing a jury verdict of guilt. *United States v. Clayborne*, 509 F.2d 473, 475 (D.C. Cir. 1974); *United States v. Alexander*, 331 F.3d 116, 127 (D.C. Cir. 2003). The five appellants in this case are John Franklin, William Robinson, George Wilson, Joseph Blackson, and William Simmons.

In 2002, the FBI and the Metropolitan Police Department of Washington, D.C., initiated an intensive investigation of criminal activity in a four-block area around 18th Street and M Street in Northeast Washington. Officers viewed the neighborhood at the time as "an open air drug market." Mar. 28, 2006 AM Trial Tr. at 95 (Officer Carlton Herndon). The air smelled of PCP, and the area was filled with broken vials. *Id.* at 100; *id.* at 40 (Officer Michael Morawski). Detectives patrolling the area could easily find bottles of PCP hidden along the edges of buildings and walkways. *Id.* at 100 (Officer Carlton Herndon).

During its investigation, the government uncovered a large-scale drug ring. John Franklin had a supplier outside the M Street Crew from whom he bought at least 15 to 20 gallons of PCP between 2002 and 2004. Mar. 14, 2006 AM Trial Tr. at 65 (Herbert Martin). Franklin, in turn, supplied the M Street Crew primarily with liquid PCP and ecstasy pills. Mar. 22, 2006 AM Trial Tr. at 73–74 (Elizabeth Lee); Apr. 19, 2006 PM Trial Tr. at 29–30 (Roberta Moore).

Franklin's routine was generally consistent. He would obtain PCP from his supplier. Then, Franklin's common-law wife, Elizabeth Lee, would rebottle the drug into ounce and half-ounce bottles for Franklin to sell on the street or to lower-level dealers. Mar. 22, 2006 PM Trial Tr. at 7 (Elizabeth Lee). Before selling his now-bottled product, Franklin employed a neighborhood woman, Monica Bell, to "test it out." *Id.* at 40, 43. Bell sampled Franklin's PCP about "three times a week" in exchange for occasional "free dippers," cigarettes soaked in PCP. Apr. 18, 2006 PM Trial Tr. at 82, 86 (Monica Bell).

After testing, Franklin would supply the drugs to the Crew. Often, these drug transactions would occur in person. *See, e.g.*, Apr. 27, 2006 AM Trial Tr. at 85 (Omari Minnis) ("Normally I

might go to him once, twice a week. Get about a ounce, two ounces."). When Franklin was not available, however, he delegated to his lieutenants. *See, e.g.*, Apr. 24, 2006 PM Trial Tr. at 32, 38 (Ronnie Tucker); Aug. 11, 2003 Wiretap Tr. at 2–3; May 2, 2006 AM Trial Tr. at 15 (Michael Abney). Franklin sold PCP to those he supplied in half-ounce bottles for $250 and ecstasy pills in ten-packs for $100. Mar. 22, 2006 AM Trial Tr. at 73–74 (Elizabeth Lee); Apr. 20, 2006 PM Trial Tr. at 28–29 (April Jackson).

Franklin's role was not limited to that of a supplier. At trial, other members of the Crew described Franklin as their "organizer" and "leader." Apr. 24, 2006 AM Trial Tr. at 107 (Ronnie Tucker); May 2, 2006 AM Trial Tr. at 10–12 (Michael Abney). Indeed, members of the Crew brought Franklin in to mediate disputes and to "keep[] M Street in order." May 2, 2006 AM Trial Tr. at 12 (Michael Abney). Even when uninvited, Franklin often played a mediating role between Crew members. *See id.* at 39. When absent from 18th and M, Franklin would check in on the Crew, sometimes giving advice about their selling methods. *See, e.g.*, Sept. 30, 2003 Wiretap Tr. at 2.

Below Franklin in the Crew's hierarchy were his three lieutenants: William Robinson, George Wilson, and Joseph Blackson. May 2, 2006 AM Trial Tr. at 13–15 (Michael Abney). Those men supplied the Crew with PCP in Franklin's absence. *Id.* at 29; Apr. 24, 2006 PM Trial Tr. at 14–15 (Ronnie Tucker). The lieutenants would "take on the situations when John [was] not around as far as money, or drugs or problems that's going on that's involved in the area, keep things intact" so as not to mess up the Crew's "money spot." May 2, 2006 AM Trial Tr. at 15 (Michael Abney). Their job was "to oversee everything for the top man. To make sure everything on the block going the way that he . . . would want it to be and see to it

that its foot soldiers everybody taken care of, everybody straight." May 3, 2006 AM Trial Tr. at 22 (Michael Abney).

William "Dee" Robinson was one of Franklin's closest friends. Mar. 23, 2006 AM Trial Tr. at 22 (Elizabeth Lee). Robinson "would hold bottles" of PCP for Franklin when he was away from 18th and M, Apr. 27, 2006 AM Trial Tr. at 91 (Omari Minnis), and communicated regularly with Franklin about the Crew's drug sales and supply, *see, e.g.*, Apr. 24, 2006 PM Trial Tr. at 66–67 (Ronnie Tucker); Aug. 21, 2003 Wiretap Tr. at 1. On Sundays, which Franklin spent with his family, Robinson was sometimes in charge of the Crew. *See* May 2, 2006 AM Trial Tr. at 28–29 (Michael Abney).

George "Shug" Wilson was like a sibling to Franklin. *Id.* at 35. When Franklin was unavailable, he regularly referred buyers to Wilson, who sold some of the PCP supplied by Franklin. *Id.* at 29; Apr. 24, 2006 PM Trial Tr. at 15 (Ronnie Tucker). Wilson played an enforcement role in the Crew; he defended its preeminence in the 18th and M area from outsiders, sometimes by force. *See* Sept. 27, 2003 Wiretap Tr. at 1–2; Oct. 3, 2003 Wiretap Tr. at 1, 4–6; May 3, 2006 PM Trial Tr. at 34–35 (Robin Tamika Hazel) ("Shug pulled his gun out on him and made him leave. . . . Told him to leave from off his block. This is his block."). Moreover, like Robinson, Wilson was sometimes in charge of the Crew in Franklin's absence. May 2, 2006 AM Trial Tr. at 28–29 (Michael Abney). This authority position was apparent to onlookers; a police officer who regularly patrolled 18th and M initially took Wilson to be "in charge" of the Crew. Mar. 28, 2006 PM Trial Tr. at 11, 13–14 (Officer Carlton Herndon).

Joseph "Joe Black" Blackson, Franklin's younger brother, also distributed PCP in Franklin's absence. In addition, Blackson held drugs for his brother. Apr. 24, 2006 PM Trial Tr.

at 17–18 (Ronnie Tucker). In his dealings with an undercover officer, Blackson equated himself with Franklin, stating that "dealing with John is just as dealing with him." Apr. 4, 2006 PM Trial Tr. at 97 (Officer Donna Leftridge). Blackson was the only one of the lieutenants to be absent from the 18th and M Street area for any length of time during the investigation; he was arrested on July 29, 2003, when police found drugs in the glove compartment of his car. Apr. 12, 2006 PM Trial Tr. at 60–74 (Officer Max Luis Salazar). Blackson was then incarcerated for an indeterminate period of time before returning to 18th and M. *See* Reply Br. at 69; Aug. 31, 2006 Sent. Hg. at 67.

Beneath Franklin's three lieutenants was a class of "foot soldiers" who made individual sales in the 18th and M area. May 2, 2006 AM Trial Tr. at 18–19 (Michael Abney). Although the foot soldiers were numerous, only one foot soldier was tried with Franklin and is party to this appeal. William "Mike" Simmons was Franklin's "loyalest foot soldier." *Id.* at 42. Witnesses variously testified that Simmons was Franklin's "[s]idekick," "runner," "helper," "little man," and "flunky." Apr. 19, 2006 PM Trial Tr. at 44 (Roberta Moore); Apr. 27, 2006 AM Trial Tr. at 88 (Omari Minnis). According to one witness, Simmons would do "[w]hatever [Franklin] told him. Sell bottles to people. If [Franklin] . . . needed anything done, he'd do it." May 2, 2006 AM Trial Tr. at 43 (Michael Abney). One of Simmons' most frequent tasks was to deliver drugs to Franklin or from Franklin to his customers. *See, e.g.*, *id.* at 51–52; Apr. 19, 2006 PM Trial Tr. at 44 (Roberta Moore); Apr. 24, 2006 PM Trial Tr. at 17 (Ronnie Tucker).

B

The M Street Crew displayed cohesion both as a business and as a social unit. As a business, the Crew guarded its

territory, permitting only Crew members to sell within the 18th and M area. Apr. 27, 2006 AM Trial Tr. at 81–82 (Omari Minnis); Apr. 24, 2006 PM Trial Tr. at 22 (Ronnie Tucker) ("We ain't allow nobody to sell drugs around there that wasn't from around there."). The Crew used graffiti to mark its territory. *See, e.g.*, Record Materials for Appellee at 95–105. Moreover, the Crew's monopoly on drug sales within its turf was strictly enforced; if someone from outside the Crew attempted to sell drugs in the Crew's territory, he would "either get hurt real bad or he wouldn't make it home." Apr. 27, 2006 AM Trial Tr. at 82 (Omari Minnis).

Economic order was maintained within the Crew as well. Franklin and the lieutenants imposed a rotational system of drug sales whereby the Crew members would "take turns" selling so that "everybody get[s] a fair share." Apr. 24, 2006 PM Trial Tr. at 5 (Ronnie Tucker). Under this system, each Crew member would be permitted to make a single sale — regardless of the magnitude of the sale — before relinquishing the turf to another Crew member. Apr. 27, 2006 AM Trial Tr. at 80 (Omari Minnis) ("say it was five of us outside, you know, whoever was outside first goes first, come up second, go second. Don't matter how much they wanted or, you know, they wanted eight dippers it's your turn.").

The Crew members also protected their turf and each other from potential threats in the form of police officers and outsiders. When police were in the area, Crew members would alert one another to the potential threat. Mar. 28, 2006 AM Trial Tr. at 41 (Officer Carlton Herndon) ("When I came into the area, either on a bike or a car, they would always give a heads up that I was in the area."); Apr. 24, 2006 PM Trial Tr. at 7 (Ronnie Tucker) ("We warn each other."). Similarly, when outsiders attacked Crew members, the Crew fought back, sometimes exchanging gunfire. *See, e.g.*, Apr. 27, 2006 PM

Trial Tr. at 6–8 (Omari Minnis); May 2, 2006 AM Trial Tr. at 73–80 (Michael Abney).

Finally, the Crew was a cohesive social unit. Crew members socialized together, frequenting local dance clubs. Apr. 6, 2006 AM Trial Tr. at 18–20 (Ricardo Love). Crew members would flash an M-shaped hand signal to one another, signaling their membership in the M Street Crew. *See* Record Materials for Appellee at 122–23, 125. Musicians at the local clubs recognized the group as a defined unit, giving a "shout out" that the M Street Crew was "[i]n the house." Apr. 6, 2006 AM Trial Tr. at 20–21 (Ricardo Love).

C

The massive investigation of the M Street Crew culminated in 39 arrests on March 16, 2004. Mar. 10, 2006 AM Trial Tr. at 45 (Agent Joseph Sopata). Among those arrested and later indicted were Franklin, Robinson, Wilson, Blackson, and Simmons, appellants here. Those five were tried together. After a lengthy trial, the jury convicted each defendant of the bulk of the drug charges leveled against him. The defendants were acquitted of various weapons and violent crime charges.

The jury convicted Franklin of one count of conspiracy to distribute and possess with intent to distribute a controlled substance (Count 1, Judgment of Franklin at 1; Verdict at 1–3); one count of RICO conspiracy (Count 2, Judgment of Franklin at 2; Verdict at 12–13); one count of continuing criminal enterprise (Count 3, Judgment of Franklin at 2; Verdict at 4–11); 16 counts of distribution of and possession with the intent to distribute PCP, half of which occurred within 1,000 feet of a school (Counts 8, 10, 17, 21, 30, 36–37, 41–42, 44, 51, 53, 58, 63, 69, and 77, Judgment of Franklin at 2–3; Verdict at 16–20); three counts of distribution of cocaine base, one of which

occurred within 1,000 feet of a school (Counts 45, 52, and 67, Judgment of Franklin at 2; Verdict at 17–18); five counts of distribution of ecstasy and possession with the intent to distribute ecstasy, two of which occurred within 1,000 feet of a school (Counts 50, 57, 68, and 77–78, Judgment of Franklin at 2–3; Verdict at 17–20); 27 counts of unlawful use of a communication facility (Counts 83–109, Judgment of Franklin at 3; Verdict at 20–23); two counts of use or possession of a firearm during a drug-trafficking offense (Counts 135 and 137, Judgment of Franklin at 3; Verdict at 14–15); and two counts of being a felon in possession of a firearm (Counts 136 and 138, Judgment of Franklin at 3; Verdict at 14–15). Franklin was also acquitted of several of the charges against him, most notably of all murder, assault, and related charges (Counts 2, 129–32, 148–49, and 158–59, Verdict at 12, 14–15). In acquitting Franklin of those charges, the jury found that the RICO conspiracy did not involve murder (Count 2, Verdict at 12).

Franklin's lieutenants were also convicted of both narcotics and RICO conspiracies, as well as of various distribution charges, but acquitted of violent crime charges. Unlike Franklin, none of the lieutenants was charged with leading a continuing criminal enterprise.

Blackson was convicted of one count of conspiracy to distribute and possess with intent to distribute a controlled substance (Count 1, Judgment of Blackson at 1; Verdict at 24–26); one count of RICO conspiracy (Count 2, Judgment of Blackson at 2; Verdict at 26–27); eleven counts of distribution of PCP, most occurring within 1,000 feet of a school (Counts 6, 9–10, 13, 16, 19, 23–24, 27, 33, and 42, Judgment of Blackson at 2; Verdict at 27–29); two counts of possession with intent to distribute ecstasy (Counts 7 and 43, Judgment of Blackson at 2; Verdict at 27, 29); one count of using, carrying, or possessing a firearm during a drug trafficking crime (Count 133, Judgment of

Blackson at 2; Verdict at 27); and one count of possession of a firearm by a convicted felon (Count 134, Judgment of Blackson at 2; Verdict at 27). The jury found that the RICO conspiracy did not involve murder (Count 2, Verdict at 26).

Robinson, similarly, was convicted of one count of conspiracy to distribute and possess with intent to distribute a controlled substance (Count 1, Judgment of Robinson at 1; Verdict at 30–31); one count of RICO conspiracy (Count 2, Judgment of Robinson at 2; Verdict at 32); two counts of PCP distribution, one within 1,000 feet of a school (Counts 36 and 58, Judgment of Robinson at 2; Verdict at 33); one count of possession with the intent to distribute PCP (Count 73, Judgment of Robinson at 2; Verdict at 33); and three counts of unlawful use of a communication facility (Counts 96, 101, and 103, Judgment of Robinson at 2; Verdict at 34). The jury found that the RICO conspiracy did not involve murder (Count 2, Verdict at 32).

Wilson, the third lieutenant, was convicted of one count of conspiracy to distribute and possess with an intent to distribute a controlled substance (Count 1, Judgment of Wilson at 1; Verdict at 41–42); one count of RICO conspiracy (Count 2, Judgment of Wilson at 2; Verdict at 43); and three counts of unlawful use of a communication facility (Counts 104–06, Judgment of Wilson at 2; Verdict at 44). The jury found that the RICO conspiracy did not involve murder (Count 2, Verdict at 43).

Finally, Simmons, the only foot soldier to be tried with Franklin and the lieutenants, was convicted of one count of conspiracy to distribute and possess with intent to distribute a controlled substance (Count 1, Judgment of Simmons at 1; Verdict at 35–36); one count of RICO conspiracy (Count 2, Judgment of Simmons at 2; Verdict at 37); and three counts of

distribution of PCP within 1,000 feet of a school (Counts 8, 10, and 30, Judgment of Simmons at 2; Verdict at 39–40). The jury acquitted Simmons of all murder, assault, and weapons charges (Counts 2, 129–32, 148–49, and 158–59, Verdict at 37–39). In doing so, it found that the RICO conspiracy did not involve murder (Count 2, Verdict at 37).

At sentencing, Franklin, Robinson, and Wilson were all sentenced to life in prison. Judgment of Franklin at 4; Judgment of Robinson at 3; Judgment of Wilson at 3. Blackson was sentenced to a total of 35 years of imprisonment, followed by 10 years of supervised release. Judgment of Blackson at 3–4. Simmons was sentenced to 22 years of imprisonment, followed by five years of supervised release. Judgment of Simmons at 3–4.

## D

On appeal, appellants raise eleven discrete challenges to their convictions and sentences.

First, all appellants argue that their cross-examination of the government's key witness, Officer Donna Leftridge, was improperly limited in violation of the Confrontation Clause.

Second, Blackson, Robinson, Simmons, and Wilson contend that they were prejudiced by the district court's improper denial of their motion for severance. They argue that statements made by Franklin's counsel during his opening and closing statements destroyed their ability to receive a fair and impartial trial.

Third, all five appellants assert that the district court erred in its jury instructions concerning the RICO conspiracy charge. Specifically, they argue that the district court erred (1) in not

instructing the jury that a conviction for RICO conspiracy requires a finding that a defendant participated in the operation or management of the enterprise; (2) in not instructing the jury that an "enterprise" must include an element of structure; and (3) in not instructing the jury that continuity is a necessary element of a "pattern of racketeering activity."

Fourth, Simmons contends that the prosecution improperly vouched for witness Roberta Moore. In doing so, Simmons claims, the government improperly invoked the authority of both the government and the court to support Moore's veracity.

Fifth, Simmons argues that the district court abused its discretion in denying his motion to strike testimony about his lifestyle that he deems "extraordinarily prejudicial." Appellants' Br. at 16.

Sixth, Robinson contends that the district court erred in denying him permission to call two lay witnesses who were familiar with drug dealing and with the 18th and M Street area respectively. The district court ruled that the two witnesses' testimony would amount to expert testimony under Rule of Evidence 702. Robinson contends, however, that the two witnesses were qualified to testify as lay witnesses based on their firsthand experience of drug sales and of the 18th and M area.

Seventh, Wilson argues that the district court erred in denying his motion to suppress evidence obtained from a warrantless search of his fiancée's house. Wilson contends that the consent furnished to police by his fiancée was involuntarily procured. He argues that all evidence from the search was obtained unlawfully and should have been suppressed.

Eighth, Franklin claims that the evidence presented at trial was insufficient to support the jury's finding that he engaged in a continuing criminal enterprise. Specifically, he contends that insufficient evidence was presented at trial to prove that he organized, supervised, or managed five or more people.

Ninth, Blackson claims that the district court erred in entering judgment against him for a count of which he was not convicted.

Tenth, Simmons argues that the district court erred both procedurally and substantively in imposing an above-Guidelines sentence on him. Procedurally, he contends first that the district court impermissibly relied on his history of drug abuse in increasing his sentence and, second, that the district court failed to provide him with a written statement of the reasons for the variance. Substantively, he alleges that the district court failed to take into account aspects of his personal history that would have counseled in favor of a lower sentence.

Finally, Robinson, Wilson, and Blackson contend that the district court based their sentences on erroneous factual findings. First, all three appellants claim the district court incorrectly attributed 30 or more kilograms of PCP to each of them. Second, Wilson and Blackson contend that the district court incorrectly imposed a three-level Guideline enhancement for their role in the conspiracy.

II

Appellants contend their rights under the Confrontation Clause of the Sixth Amendment to the Constitution were violated in two respects: (A) when the district court limited cross-examination of undercover police officer Donna Leftridge by failing to order the government to disclose during trial

information it had failed to turn over as required by *Brady v. Maryland*, 373 U.S. 83 (1963), regarding an ongoing investigation of Officer Leftridge; and (B) when the district court prohibited all questioning regarding Officer Leftridge's alleged inappropriate social relationship with appellant John Franklin. Appellants maintain that they were consequently deprived of "all opportunities to impeach Leftridge's credibility." Appellants' Br. at 23.

The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. CONST. amend. VI. The Amendment guarantees a defendant the right to cross-examine the witnesses against him or her, and it is "the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 315–16 (1974). The district court must "give a defendant a 'realistic opportunity to ferret out a potential source of bias.'" *United States v. Davis*, 127 F.3d 68, 70 (D.C. Cir. 1997) (quoting *United States v. Derr*, 990 F.2d 1330, 1334 (D.C. Cir. 1993)). "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986) (quoting *Davis v. Alaska*, 415 U.S. at 318). Our review of the district court's legal conclusions regarding the Confrontation Clause is *de novo*. *United States v. Carson*, 455 F.3d 336, 362 (D.C. Cir. 2006).

15

A

Appellants and their counsel did not learn until March 28, 2006, in the middle of the trial, that Leftridge had been suspended by the Internal Affairs Division ("IAD") of the Metropolitan Police Department ("MPD") due to an ongoing investigation. The day before, on March 27, prosecutors *ex parte* informed the district court that Leftridge had been suspended with pay by IAD due to [REDACTED]
Leftridge had confirmed to the prosecutors that she did not know the basis of the investigation. The prosecutors advised the district court that Leftridge was under investigation [REDACTED]

Leftridge was placed on the "*Lewis* List" of MPD officers who are under investigation.[1]

The district court concluded that the nature of the ongoing investigation of Leftridge was of limited relevance to her credibility or any potential bias but directed the prosecutors to disclose her status to defense counsel. The following day, March 28, 2006, the government disclosed to defense counsel, in writing, that: (1) IAD had suspended Leftridge with pay in early December 2005; (2) Leftridge was on the *Lewis* list; (3) Leftridge knew she was under investigation but not why or by whom; and (4) Leftridge was not under investigation by the U.S. Attorney's Office for the District of Columbia. The

---

[1] *See United States v. (Walter) Bowie*, 198 F.3d 905, 907–08 (D.C. Cir. 1999); *Lewis v. United States*, 408 A.2d 303 (D.C. 1979).

government's disclosure did not mention [REDACTED]

Defense counsel sought additional disclosure pursuant to *Brady*, 373 U.S. 83, and *Giglio v. United States*, 405 U.S. 150 (1972), or, failing that, an *in camera* review by the district court of the evidence supporting the government's limited disclosure. The district court denied the request for additional disclosure, stating it had already conducted an *in camera* review. However, on March 30, 2006, the district court requested confirmation of the *ex parte* information [REDACTED]

In *United States v. Bagley*, 473 U.S. 667 (1985), the Supreme Court held that the withholding of potentially relevant impeachment evidence does not implicate the Confrontation Clause in the sense of "any direct restriction on the scope of cross-examination." *Id.* at 678. Instead, "the constitutional error, if any," involves "the Government's failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination." *Id.* This latter duty arises under the Due Process Clause of the Fifth Amendment. *See id.* at 675; *see also Brady*, 373 U.S. at 86. As a plurality explained in *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987), the Confrontation Clause did not create "a constitutionally compelled rule of pretrial discovery" of information that might be useful to the defense in preparing for trial. *Id.* at 52. Instead, "the right to confrontation is a *trial* right, designed to prevent improper restrictions on the types of questions that defense

counsel may ask during cross-examination." *Id.* (emphasis in original). This court has adopted the plurality's holding. *United States v. Tarantino*, 846 F.2d 1384, 1415–16 (D.C. Cir. 1988). Based on their access to the *ex parte* information of March 27, 2006 for the first time after filing their opening brief, appellants have added to their Confrontation Clause contention a *Brady* claim regarding the investigation of Leftridge.

The Supreme Court held in *Brady* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Thereafter the Court held that such disclosure is mandatory regardless of whether a defendant requests it, *United States v. Agurs*, 427 U.S. 97, 107 (1976), and that impeachment evidence must also be disclosed, *see Bagley*, 473 U.S. at 676; *Giglio*, 405 U.S. at 154. To determine whether there has been a *Brady* violation, courts apply a three-part test. "The evidence at issue must [1] be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must [2] have been suppressed by the [government], either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). For prejudice to have ensued, there must be a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," *id.* at 280 (internal quotation marks omitted), i.e., "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," *Kyles v. Whitley*, 514 U.S. 419, 435 (1995); *see Bagley*, 473 U.S. at 682.

Appellants contend that the district court erred by failing to order the government to make two required disclosures: (1) the subject matter of the investigation of Leftridge and (2)

18

[REDACTED]                             This court has held that "to be 'material' under *Brady*, undisclosed information or evidence acquired through that information must be admissible." *Derr*, 990 F.2d at 1336; *see United States v. Johnson*, 592 F.3d 164, 171 (D.C. Cir. 2010); *see also Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (per curiam). Our review of the district court's evidentiary rulings is for abuse of discretion. *United States v. Lin*, 101 F.3d 760, 768 (D.C. Cir. 1996).

With regard to non-disclosure of the subject matter of the investigation, the government persuasively maintains that there was no *Brady* violation because the undisclosed information would not have been admissible at trial, and appellants do not maintain that their knowledge of it could have led to admissible evidence. Although the defense might have sought to use the undisclosed information about the subject matter of the investigation to impeach Leftridge pursuant to Federal Rule of Evidence 608(b),[2] the district court would properly have ruled such cross-examination improper because the subject matter of the internal investigation [REDACTED]

                             would not have been probative of Leftridge's truthfulness. Without additional evidence of wrongdoing beyond bald assertions [REDACTED]

                             , impeachment would have been

---

[2] Rule 608(b) provides in relevant part:

Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness . . . may . . . in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

based on unproven allegations.  As this court stated in *United States v. Morrison*, 98 F.3d 619, 628 (D.C. Cir. 1996), "the mere *filing* of a complaint [against a witness] is not probative of truthfulness or untruthfulness." (emphasis in original) (internal quotation marks omitted).

Additionally, had the defense sought admission of the subject matter of the investigation pursuant to Federal Rule of Evidence 404(b)[3] to show Leftridge's motive or bias, *see generally United States v. Crowder*, 141 F.3d 1202, 1206, 1209–10 (D.C. Cir. 1998) (en banc), it is difficult to understand how the subject matter, rather than the fact of the existence of the investigation, would have assisted in portraying Leftridge as biased.  Appellant William Simmons' counsel cross-examined Leftridge about her suspension without pay and the suspension of her police powers as a result of the ongoing investigation, eliciting her admission to the suspension but also her denial of knowledge of the basis for the investigation.  Presumably, based upon her suspension, Leftridge could have been motivated to testify falsely against appellants in order to curry favor with the government.  But the fact that she was being investigated at all provided that potential motive.  Even assuming information about the subject matter of the investigation was probative of bias, the district court would properly have excluded cross-examination pursuant to Rule 403 because "its probative value [wa]s substantially outweighed by the danger of unfair

---

[3]  Rule 404(b) provides in relevant part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

prejudice." FED. R. EVID. 403.  As the district court concluded, the "prejudice to this officer given the uncertainty of the [allegations] is quite high, the prejudice to her career and her credibility is quite high."  Mar. 27, 2006 *Ex Parte* Tr. at 10. That risk of prejudice would have substantially outweighed the minimal probative value of the evidence.

By contrast, the undisclosed information [REDACTED]

would have been admissible pursuant to Rule 404(b) to show motive and bias.  *See United States v. (Juan) Bowie*, 232 F.3d 923, 930 (D.C. Cir. 2000). [REDACTED]

On direct examination Leftridge denied she had been told why she was under investigation and why her police powers had been suspended; on cross-examination she acknowledged that she believed she was under investigation by IAD. These statements do not rule out Leftridge's knowledge [REDACTED]

Despite Leftridge's apparent knowledge [REDACTED] , the government disclosed to the defense only that she was suspended by IAD and was "under investigation."  Defense counsel understood the disclosure to mean that the investigation was being conducted by IAD only, as evidenced, for example, by defense counsel's cross-examination of Leftridge: "You are being investigated by the internal affairs division of the Metropolitan Police

Department?" Apr. 5, 2006 AM Trial Tr. at 77. Upon obtaining access to sealed materials after filing their opening brief, appellants contended in their reply brief that requiring Leftridge to admit [REDACTED]

would have strengthened their argument to the jury that Leftridge's testimony was biased due to an "incentive to curry favor with the government." Reply Br. at 13–14, 16. This argument is compelling. [REDACTED]

It is true that the government disclosed to the defense that the U.S. Attorney's Office for the District of Columbia was not investigating Leftridge, thus lessening the potential desire for Leftridge to curry favor with the prosecutors who were conducting appellants' prosecution. But this disclosure also implied, as defense counsel reasonably understood, [REDACTED]

In any event, this aspect of the disclosure cannot excuse the government's non-disclosure [REDACTED]

The defense was entitled to

information that would strengthen its impeachment of Leftridge, whom the defense viewed as a key government witness because she interpreted video and audio tapes of the defendants and also engaged in repeated undercover drug purchases with several defendants, including appellants (except Wilson). *See United States v. (Walter) Bowie*, 198 F.3d 905, 909 (D.C. Cir. 1999). Given its relevance as impeachment evidence, the government had a duty under *Brady* to make a timely pretrial disclosure to the defense [REDACTED]

*See United States v. Pollack*, 534 F.2d 964, 973 (D.C. Cir. 1976). The district court, in turn, erred in limiting cross-examination of Leftridge by failing to order the government to disclose this admissible evidence to the defense during trial.

The question remains whether the undisclosed evidence [REDACTED] was "material," i.e., was there "a reasonable probability that the result of the trial would have been different if the suppressed [evidence] had been disclosed to the defense." *Strickler*, 527 U.S. at 289 (internal quotation marks omitted). The "materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions." *Id.* at 290. Instead, a court must ask whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 527 U.S. at 435.

As an initial matter, it is worth noting that a reasonable jury could easily have concluded that Leftridge [REDACTED] "would be careful not to worsen [her] predicament" by perjuring herself, *see (Walter) Bowie*, 198 F.3d at 909. Secondly, as appellants must concede, and as the district court found, much of Leftridge's testimony was

corroborated by physical evidence including video and audio tapes, and to the extent Leftridge testified to what was also demonstrated by physical evidence, her credibility would be unimpaired. *See id.* at 911. Thirdly, given the physical evidence corroborating much of Leftridge's testimony, appellants cannot show materiality under *Brady* by claiming that any bias would have affected the entirety of her testimony. Instead, appellants must contend that Leftridge was careful to mislead the jury only where her testimony would not go beyond what the physical evidence demonstrated — a degree of tailoring that would appear implausible.

In any event, we conclude, upon review of the likely effect of informing the jury of the undisclosed evidence [REDACTED] , that there is not a reasonable probability that the result of the trial would have been different for any appellant. Leftridge testified regarding the drug and RICO conspiracies (Counts 1 and 2), of which each appellant was convicted; the continuing criminal enterprise (Count 3) of which Franklin was convicted; and the drug distribution counts of which Franklin, Blackson, Robinson, and Simmons were convicted. As regards the drug distribution counts, Franklin conceded his guilt, Wilson faced no charges, and Robinson did not contest the single count against him, where he is plainly visible on videotape. Therefore, only the drug distribution convictions of Blackson and Simmons could even theoretically be called into question through the impeachment of Leftridge with the undisclosed evidence.

1

As to the convictions of all appellants for drug conspiracy (Count 1) and RICO conspiracy (Count 2), and the conviction of Franklin for continuing criminal enterprise (Count 3), the non-disclosure [REDACTED] was

not material. Each appellant was convicted of conspiracy to distribute and possess with intent to distribute one kilogram or more of phencyclidine ("PCP"), and 50 grams or more of cocaine base in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A)(iii), (iv). The volume of PCP distributed, 15–20 gallons — equivalent to 39–52 kilograms — was proven through the testimony of Franklin's supplier, Herbert Martin. Each appellant's involvement was proven in multiple ways without Leftridge's testimony.

• **Count 1.** The government demonstrated the existence of the conspiracy largely through evidence from cooperating members of the M Street Crew, through wiretaps of Franklin's cellphone, and through the physical evidence accumulated during Leftridge's undercover buys. For instance, cooperator Ronnie Tucker identified Joseph Blackson, "Mike" Simmons, "Dee" Robinson, and "Shug" Wilson as selling drugs, and recognized John Franklin as the leader of the group. Tucker also testified that "we all sold drugs together. Besides that [we] watch each other's back, make sure everybody was all right." Apr. 24, 2006 PM Trial Tr. at 4–5. Similarly, cooperator Michael Abney testified that the M Street Crew would do "a variety of things" together including "selling drugs." May 2, 2006 AM Trial Tr. at 9. He named Franklin as the leader, Blackson, Robinson, and Wilson as Franklin's lieutenants, and Simmons as Franklin's most loyal foot soldier. The wiretap, audio, and video evidence corroborated the testimony of the cooperators, who were impeached on cross-examination, and provided ample evidence of conspiracy. For example, according to the transcript of Franklin's wiretapped cellphone call on August 11, 2003, Franklin told Tucker to buy PCP from Robinson rather than himself. And on the November 21, 2002 videotape recording, Leftridge bought PCP at 18th and M Streets from someone (not visible on the recording) who identified himself as "Joe" and who eventually gave her his

cellphone number. Later, on January 7, 2003, when Leftridge came back to the area to buy from "Joe," she instead bought PCP from John Franklin, who is clearly visible on videotape, and referred to "Joe" as his brother. When Franklin exited Leftridge's car, he yelled "Mike" and another individual came to the passenger window and delivered a vial. That individual's face is plainly visible. On April 10, 2003, following a cellphone conversation with Franklin, that same individual is seen on videotape getting into the car to deliver drugs to Leftridge. Again, his face was plainly visible, and a juror would have been able to recognize him in both instances as Simmons.

The above represents only a small part of the evidence demonstrating a conspiracy under 18 U.S.C. § 846. Even were Leftridge's testimony discredited by the undisclosed evidence, there is not a reasonable probability of a different verdict on Count 1 for any appellant.

• **Count 2.** Similarly, each appellant was convicted of conspiracy under RICO, 18 U.S.C. § 1962(d). Pursuant to the district court's instructions, the jury had to find: (1) an enterprise — in this case an illegal association in fact — existed; (2) the enterprise engaged in or affected interstate commerce; (3) individual defendants knowingly and intentionally agreed with another person to conduct the affairs of the enterprise; and (4) each defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts. *See infra* Part IV. Elements one and three appear to have been proven primarily through cooperators. For instance, Abney described the structure of the M Street Crew, and Tucker described each of the five appellants as "members" of M Street. Leftridge's testimony as to individual buys added little information about the M Street Crew's structure, but the physical evidence accompanying her buys did corroborate the cooperators' testimony. For example, on March 26, 2003

Blackson told Leftridge that "everybody . . . buy from us." Mar. 26, 2003 Wiretap Tr. at 4. As to element four, impeachment of Leftridge's testimony with the undisclosed information would have done nothing to undermine the evidence that each appellant committed two or more racketeering acts. As noted, Franklin conceded his guilt as to all of the drug distribution charges. Wilson was not charged with drug distribution, so the two racketeering acts of which the jury found him guilty could not have involved Leftridge's undercover buys. Robinson's guilt was plain on videotape showing the May 21, 2003 sale with which he was charged, his sole possible racketeering act related to Leftridge's undercover work. Blackson is readily visible on videotape of the March 26, 2003 undercover buy and gave Leftridge his cellphone number and referred to himself as "Joe" during the November 21, 2002 buy, effectively identifying himself as the seller. Simmons is twice seen on videotape delivering drugs to Leftridge; he conceded guilt as to the April 10, 2003 buy.

Again, the above are only examples of the evidence of guilt that render a different result on Count 2 highly improbable even were the jury, based on the undisclosed evidence, to discount Leftridge's testimony.

• **Count 3.** Franklin was charged with being the principal administrator, organizer, or leader of a continuing criminal enterprise, in violation of 21 U.S.C. § 848. This count required the government to prove that he supervised five or more persons. Evidence unrelated to Leftridge's testimony showed that Franklin supervised five or more people. *See infra* Part IX. Although appellants suggest that Leftridge provided the only evidence that Franklin and Blackson worked together and that Franklin directed other members of the Crew to deliver PCP to a buyer, this ignores the physical videotape evidence of Leftridge's buys. For instance, on January 7 and April 10, 2003,

Simmons' face is visible on videotape as he delivered drugs immediately after Leftridge spoke to Franklin. And on January 22, 2003, after Leftridge contemporaneously identified "Joe" [Blackson] and asked him for a "whole one," Franklin got into Leftridge's car, took Leftridge's money, and asked her why "Joe" gave her a good price and later, "what's up with you and Joe . . . what's up with you and my little brother?" Jan. 22, 2003 Wiretap Tr. at 1, 3, 6.

The physical evidence thus demonstrates, without Leftridge's testimony, that Simmons acted as Franklin's runner and that Blackson and Franklin worked together. Undermining Leftridge's credibility through impeachment with the undisclosed evidence would therefore have had no impact on Franklin's conviction of Count 3. Although Franklin challenges the sufficiency of the evidence that he managed at least five people, *see infra* Part IX, his Count 3 conviction was not based in large part on Leftridge's testimony and, to the extent her testimony related to the Count 3 charge, it is corroborated by physical evidence.

2

Joseph Blackson was convicted of eleven counts of drug distribution, from November 21, 2002 (Count 6) through July 16, 2003 (Count 42). According to the government's brief, and uncontested in appellants' reply brief, Blackson acknowledged his guilt of distribution on March 26 and April 30, 2003 (Counts 27 and 33). Further, neither at trial nor on appeal has Blackson contested the identification of his voice with respect to the recorded undercover buys by Leftridge or the wiretapped cellphone calls. The transcripts of those recorded buys and calls identify Blackson as selling drugs to Leftridge on eight occasions (Counts 9, 10, 13, 16, 19, 23–24, and 42). During the November 21, 2002 sale (Count 6), Blackson's voice is audible

and matches the voice on the audiotape for March 26, 2003 (Count 27), a count of which Blackson acknowledged guilt. And during the same November 21, 2002 sale, Blackson gave Leftridge his cellphone number and identified himself as "Joe." Other recorded evidence also supports Blackson's convictions. On January 15, 2003 (Count 9), Blackson noted he had been "on house arrest for a minute," Jan. 15, 2003 Wiretap Tr. at 2, which corresponded with his arrest on January 3, 2003. On several occasions, Leftridge greeted Blackson by name (Counts 16, 23, and 42), and she frequently identified Blackson contemporaneously to her supervisors before or after buying drugs (Counts 10, 13, and 24).

As these examples indicate, the evidence against Blackson on drug distribution was overwhelming, and there is no reasonable probability that any of the distribution verdicts would have been different had Leftridge's testimony been impeached by the undisclosed evidence.

### 3

Appellants contend that impeachment of Leftridge with the undisclosed evidence would have especially undermined the evidence against William Simmons for distribution of PCP within 1,000 feet of a school on January 7 and 22 and April 10, 2003 (Counts 8, 10, and 30). However, Simmons is visible on videotape handing drugs to Leftridge on April 10, 2003. Simmons also is visible on videotape of the sale on January 7, 2003, when Franklin exited the car, shouted "Mike," and Simmons appeared at the passenger door to deliver a vial of drugs to Leftridge.

Appellants note that on January 7 and April 10 the police contemporaneously had difficulty identifying Simmons. But this is unremarkable because Leftridge testified that at the time

of the April 10, 2003 buy she had not yet heard of Simmons. It is a different question whether there is a reasonable probability that a jury, viewing Simmons in the courtroom and on videotape, would not have convicted him of Counts 8, 10, and 30 had Leftridge's testimony been impeached by the undisclosed evidence. Given the unambiguous physical evidence, there is not such a reasonable probability. This is true even as to the January 22, 2003 buy (Count 10), which is a closer call because the face of the individual on videotape delivering the drugs to Leftridge was partially obscured by a ski mask. Even without the videotape and Leftridge's testimony, however, the evidence showed: (1) During that buy, Franklin stated that the person about to deliver the PCP was his "cousin," "Mike," Jan. 22, 2003 Wiretap Tr. at 6; (2) On April 10, 2003, the next time he saw Leftridge, Simmons acknowledged that he had "done some business" with her before "round on 18th Place," Apr. 10, 2003 Wiretap Tr. at 3; and (3) cooperators testified that Simmons was Franklin's runner. Although the credibility of the cooperators was impeached, their identification of Simmons as Franklin's runner is supported by evidence that Simmons delivered drugs to Leftridge on two other occasions. Leftridge's testimony that Simmons delivered the drugs on January 22 was not inconsistent with any of the physical evidence. Moreover, the evidence that Simmons was Franklin's runner is secondary to the most damning evidence against Simmons on Count 10: the videotape of Franklin's contemporaneous identification of his cousin, "Mike." With that evidence — alongside the evidence of Simmons' previous history as Franklin's runner and two other deliveries to Leftridge — there is not a reasonable probability that a jury would have failed to convict Simmons of the January 22, 2003 sale if Leftridge's testimony had been impeached by the undisclosed evidence.

Accordingly, appellants cannot succeed on either their first Confrontation Clause contention or their *Brady* claim. The

undisclosed evidence regarding the investigation of Leftridge was not "material" under *Brady*. And, in view of the overwhelming evidence of appellants' guilt, any error by the district court in limiting cross-examination by failing to order the government to provide the defense with the undisclosed evidence regarding the investigation of Leftridge was harmless beyond a reasonable doubt, *see Chapman v. California*, 386 U.S. 18, 24 (1967).

B

Appellants contend that their rights under the Confrontation Clause were also violated because the district court improperly prohibited them from questioning Leftridge about an inappropriate social relationship that she had with appellant John Franklin while she was working undercover in the investigation of the M Street Crew.

During the trial, on March 30, 2006, Franklin's counsel made an *ex parte* proffer to the district court that Franklin claimed that he and Leftridge had a social relationship beyond the scope of her role as an undercover officer. Franklin claimed that he and Leftridge had met about six times: For instance, they had dinner at Union Station, they went to the movies together on at least one occasion, and Franklin had loaned Leftridge $1,000, which she repaid approximately one week later. In support of the proffer, Franklin's counsel stated that Franklin was willing to testify under oath out of the presence of the jury about the social contacts. Further, his counsel pointed to purportedly corroborating evidence, stating that wiretap recordings indicated Franklin had seen Leftridge in her personal car; recordings of Franklin asking Leftridge what car she was driving showed, counsel asserted, that there had been contact beyond the scope of the undercover investigation. Franklin's counsel argued this evidence would "tend to show that

[Leftridge] is not reliable," or "at a minimum [had] terribly bad judgment," and that "perhaps there's some kind of bias to protect herself at this point should those allegations be true." Apr. 3, 2006 AM Trial Tr. at 4. After the district court informed the prosecutor of Franklin's proffer, the prosecutor reported to the district court that Leftridge had "flatly, categorically denie[d]" Franklin's allegations and would deny them on the witness stand. Mar. 30, 2006 PM Trial Tr. at 20.

The district court ruled it would not allow any cross-examination of Leftridge about the alleged social relationship. While not assessing the credibility of the allegations, the district court reasoned that whether Leftridge exercised bad judgment in having a social relationship with a target "doesn't go directly to her credibility or her truthfulness." Apr. 3, 2006 AM Trial Tr. at 6. In the district court's view, because "everything to which [Leftridge] is testifying is supported by video and audio tape," little room was left to impeach her credibility. *Id.* Our review is for abuse of discretion, *see Lin*, 101 F.3d at 768, not for plain error, as the government suggests, because the district court cited authority addressing limitations on cross-examination — namely *Lin* and *United States v. Whitmore*, 359 F.3d 609 (D.C. Cir. 2004) — making it "apparent from the context," FED. R. EVID. 103(a)(1), that the defense was making a Confrontation Clause claim.

The Supreme Court has instructed with regard to cross-examination to expose potential bias of a prosecution witness, that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. at 679. *See Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). So too, in

*Lin*, this court required defense counsel to "have a reasonable basis for asking questions on cross-examination which tend to incriminate or degrade the witness and thereby create an unfounded bias which subsequent testimony cannot fully dispel." 101 F.3d at 768 (internal quotation marks omitted). As a general matter, "the questioner must be in possession of some facts which support a genuine belief that the witness committed the offense or the degrading act to which the questioning relates." *Id*. (quoting *United States v. Fowler*, 465 F.2d 664, 666 (D.C. Cir. 1972)); *see Whitmore*, 359 F.3d at 622. Because testimony that Leftridge had an inappropriate social relationship with the target of an investigation she was helping to conduct would degrade her, the issue is whether the district court impermissibly impinged on appellants' confrontation rights in concluding that the defense did not have a reasonable basis for such cross-examination.

The parties disagree about whether the defense proffer provided a "reasonable basis" to allow cross-examination of Leftridge and whether *Lin* applies. In *Lin*, the defendant sought to impeach a government witness, Guan Huan Chen, through cross-examination about Chen's involvement in a gambling business located in Chinatown. 101 F.3d at 767. Lin alleged that Chen was biased against him because Chen sought "to remove Lin from the Chinatown gambling scene." *Id.* The district court "offered to hold a hearing on the matter outside the presence of the jury," but when defense counsel refused, the district court ruled that the proffer by defense counsel was not, standing alone, enough to permit the defendant "to initiate a highly prejudicial line of cross-examination." *Id.* This court affirmed. Recognizing that "[t]he questioning that [defense counsel] sought to pursue would imply that the [prosecution's] witness was involved in illegal activities, and thus would have been highly prejudicial," this court concluded that defense counsel had not met his burden to "show that the proposed line

of cross-examination followed a lead reasonably suggested by other facts in evidence." *Id.* at 768. The court noted the defense refusal to agree to a hearing outside the presence of the jury and the district court's willingness to hear other evidence supporting the defense theory. *Id.*

Appellants point out that Franklin's counsel offered more factual support for the cross-examination of Leftridge than did Lin's counsel in seeking to cross-examine a government witness. Unlike Lin, Franklin was willing to testify outside the presence of the jury,[4] and the defense proffered recorded conversations during which Franklin had asked Leftridge on two occasions about the type of car she was driving, independently indicating, according to his counsel, that Franklin knew about her personal car and not just the government car she used for undercover drug buys. The import of the tapes is not altogether clear;[5] they may simply indicate that Franklin did not realize

---

[4] The government's position that this offer was withdrawn when Franklin's counsel advised the district court that "we have nothing to add to the proffer we made [last] Thursday," Apr. 3, 2006 AM Trial Tr. at 4, is not a fair reading of the transcript. Although the district court did not accept Franklin's offer to testify, the offer was made and reaffirmed by his counsel.

[5] On April 10, 2003, when Leftridge called Franklin to set up an undercover buy, he asked her "[w]hen did I give you my number?" before appearing to realize to whom he was speaking and asking, "Oh. You drive the Acura?" Apr. 10, 2003 Wiretap Tr. at 1. During the conversation Leftridge mocks him: "You ain't even know who you was talking too [sic]. What you thought it was one of your girls again?" *Id.* at 2. The second reference to Leftridge's car, on May 21, 2003, comes from Leftridge's side of a conversation: "Huh? Yeah. I'm on the second one. Awright. It's, it's gray. It's like a dark gray. Yeah. Awright. Awright. Bye." May 21, 2003 Wiretap Tr. at 1. Leftridge testified that "[h]e was asking what car I was driving," and

with whom he was speaking when Leftridge telephoned him and needed to know the identity of the car she was driving so he could tell one of the M Street Crew to give her a vial of drugs when she arrived on the scene. Although the district court understood counsel's reference to late 2003 to refer to Leftridge's request for the $1,000 loan, the government suggests on appeal that there is some uncertainty about when the alleged social relationship occurred.[6] Of course, any uncertainty could have been explored and potentially resolved had the district court agreed to hear from Franklin outside the presence of the jury, and his testimony would have provided the district court with facts on which allowing cross-examination could turn.

---

confirmed that she was referring to the same Acura in which she had conducted previous undercover drug buys. Apr. 3, 2006 PM Trial Tr. at 33.

[6] The trial transcript of March 30, 2006 PM at 6 reads:

Franklin's counsel: The concern, Your Honor, is, given this information, we clearly believe and submit that we need to know more about what Officer Leftridge is being investigated for to the extent that that information is available.

And in addition, if there is no information, some [defense] counsel intend to examine Officer Leftridge with regard to *these contacts* with Mr. Franklin in which it is suggested that money was borrowed from him during this investigation.

*This contact*, I should say, lastly, was initiated, according to Mr. Franklin, by Officer Leftridge, who called him on his telephone, the phone that he would have been using when she was dealing with him. *That call* came in late 2003. (emphasis added)

We need not decide whether *Lin* applies where a defendant agrees to testify under oath about facts supporting a proffered line of cross-examination. Assuming the district court erred in denying any cross-examination of Leftridge about an inappropriate social relationship, appellants cannot show the requisite prejudice. Unlike harmless error analysis, which focuses on the totality of evidence against a defendant, for Confrontation Clause purposes the "prejudice inquiry . . . [focuses] on the particular witness, not on the outcome of the entire trial." *Delaware v. Van Arsdall*, 475 U.S. at 680. Even if the district court had concluded that there was a reasonable basis for cross-examining Leftridge about her alleged social relationship with Franklin, appellants fail to explain how the social relationship would be relevant to Leftridge's penchant for truthfulness, as would be necessary to use the evidence pursuant to Federal Rule of Evidence 608(b). As the district court observed, bad judgment is not the same as untruthfulness. Similarly, had defense counsel cross-examined Leftridge about the alleged social relationship, the prosecutor had reported that Leftridge would deny its existence, and the defense would have been stuck with her denial because specific instances of untruthfulness are not provable by extrinsic evidence under Rule 608(b), *see Whitmore*, 359 F.3d at 622. Even if Leftridge admitted having dinner, going to the movies, and borrowing money from Franklin, much of her testimony was corroborated by the physical evidence, and she might have offered a reasonable explanation for the social relationship relating to her continuing viability as an undercover officer in the M Street Crew investigation. Similarly, had the defense sought admission of evidence of the social relationship pursuant to Rule 404(b) to demonstrate bias, because of Leftridge's motive to curry favor with the government, it is unclear how this would assist the defense. Even if extrinsic evidence would have been admissible to prove the social relationship, Franklin's counsel stated that Franklin would testify outside the presence of the jury only if his

testimony could not be used against him at trial and, in view of Franklin's admissions of drug sales with Leftridge, that Franklin did not intend to pursue the matter at trial.  Absent an evidentiary basis, a properly instructed jury could not use the questions Leftridge was asked on cross-examination to infer bias.  *Cf. Morrison*, 98 F.3d at 628; *United States v. Gartmon*, 146 F.3d 1015, 1026 (D.C. Cir. 1998).

For these reasons, assuming the district court erred in barring cross-examination of Leftridge about an inappropriate social relationship, appellants fail to show prejudice under the Confrontation Clause.   With overwhelming evidence of appellants' guilt, *see supra* Part II.A, any error in preventing this impeachment of Leftridge was harmless beyond a reasonable doubt.  *See Chapman*, 386 U.S. at 24.  To the extent appellants contend that the district court abused its discretion under the federal rules of evidence, any error is harmless because it would not have "had substantial and injurious effect or influence in determining the jury's verdict," *Kotteakos v. United States*, 328 U.S. 750, 776 (1946).

III

The appellants other than John Franklin contend that the district court abused its discretion in denying their motions for severance of their trials.  In particular, they argue that the court's refusal to grant severance after Franklin's counsel conceded guilt on the drug distribution and communication facility counts prejudiced their right to a fair trial.

Prior to his opening statement, Franklin's counsel informed the court and other defense attorneys that Franklin intended to concede his guilt on the substantive drug distribution and communication facility counts.  Several of these counts involved other defendants:  Blackson was charged with Franklin with two

of the PCP distribution counts (Counts 10 and 42); Robinson was charged with two PCP distribution counts and three communication facility counts (Counts 36, 58, 96, 101, and 103); Simmons was charged with three distribution counts (Counts 8, 10, and 30); and Wilson was charged with three communication facility counts (Counts 104–06). Indict. at 40–49. These defendants each moved to sever, arguing that Franklin's admissions, offered without giving them any opportunity to cross-examine him, would prejudice their right to a fair trial. The court denied their motions, but instructed Franklin's counsel to make it "explicitly clear" that Franklin's admissions were not "an admission that anyone else engaged in drug dealing with him at any time." Mar. 9, 2006 PM Trial Tr. at 9. In his opening statement, Franklin's counsel stated that Franklin admitted guilt on the PCP and ecstasy distribution counts, the communication facility counts, and the felon-in-possession-of-a-firearm count. *Id.* at 15, 31. He also advised the jury that he did not represent or speak for the other defendants and that the jury should not hold Franklin's admissions against them. *Id.* at 15–16. After his opening statement, the court reiterated to the jury that the statements of counsel (including opening statements) were not evidence and explained that while Franklin's counsel had conceded Franklin's guilt, he had not admitted to joint activity with any of his codefendants. *Id.* at 52.

In his closing statement, Franklin's counsel reiterated that his client was guilty on the drug distribution counts and the communication facility counts. May 22, 2006 AM Trial Tr. at 97–98. He agreed that there was "overwhelming evidence" that Franklin had distributed PCP, or possessed it with intent to distribute, on "a number of occasions," and stated that if the jury found evidence supporting the drug distribution counts, it could simply "check guilty, guilty, guilty because we told you that in the beginning he admitted that." *Id.* at 97. In charging the jury, the court again stated that opening statements and closing

arguments were not evidence.  May 17, 2006 AM Trial Tr. at 59.  It also offered this instruction:  "Each defendant is entitled to have his innocence or guilt of the crime for which he is on trial determined from his own conduct and from the evidence that applies to him as if he were being tried alone.  The guilt or innocence of any one defendant should not control or influence your verdict as to the other defendants."  *Id.* at 79.  Blackson, Robinson, Simmons, and Wilson make a common argument that failing to sever their trials from Franklin's was reversible error.  Wilson also argues that he was entitled to severance because of the disparity between the evidence against him and the evidence against Franklin.  We address these arguments in turn.

A

Rule 8 of the Federal Rules of Criminal Procedure permits joinder of defendants who "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  FED. R. CRIM. P. 8(b).  Once joined under Rule 8, defendants may seek severance under Rule 14, which provides that "[i]f the joinder of offenses or defendants . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."  FED. R. CRIM. P. 14(a).  The appellants do not contest the propriety of initially joining their trials with Franklin's under Rule 8.  Instead, they contend they were entitled to severance under Rule 14 once Franklin made prejudicial admissions through his counsel.

We review the denial of a motion to sever for abuse of discretion.  *United States v. Gbemisola*, 225 F.3d 753, 760–61 (D.C. Cir. 2000).  Given the permissive wording of Rule 14, "we accord great deference to a district court's decision to deny severance."  *United States v. Washington*, 12 F.3d 1128, 1133

(D.C. Cir. 1994). Moreover, as the Supreme Court recognized in *Zafiro v. United States*, 506 U.S. 534 (1993), "[t]here is a preference in the federal system for joint trials of defendants who are indicted together" because joint trials "promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Id.* at 537 (internal quotation marks omitted); *see also United States v. Manner*, 887 F.2d 317, 324 (D.C. Cir. 1989) ("In general, we strike a balance in favor of joint trials."). As we have stated, this preference is "especially strong" when "the respective charges require presentation of much the same evidence, testimony of the same witnesses, and involve two defendants who are charged, *inter alia*, with participating in the same illegal acts." *United States v. Ford*, 870 F.2d 729, 731 (D.C. Cir. 1989) (internal quotation marks omitted); *see United States v. Richardson*, 167 F.3d 621, 624 (D.C. Cir. 1999) ("Joint trials are favored in RICO cases.").

In reviewing the district court's decision denying severance, we apply the standard set forth in *Zafiro*, which held that "when defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." 506 U.S. at 539. *Zafiro* gave several examples of instances in which a joint trial might create such risks: when it would permit admission of incriminating evidence that would have been inadmissible against one of the defendants, when it would require exclusion of exculpatory evidence that would have been admissible in a single defendant's trial, or when there is a marked disparity in the culpability of the defendants. *Id.*

The appellants characterize their claim as an "amalgam" of two recognized sources of prejudice: mutually antagonistic defenses and admission of a codefendant's out-of-court

statement without an opportunity for cross-examination. They acknowledge that neither situation is squarely presented here, but nonetheless assert that their situation bears some resemblance to each of these claims and that the resulting prejudice necessitated severance. Mutually antagonistic defenses exist when the defense one defendant asserts is irreconcilable with that asserted by another defendant. *United States v. Gilliam*, 167 F.3d 628, 635 (D.C. Cir. 1999). In *Zafiro*, the Supreme Court refused to adopt a bright-line rule mandating severance when mutually antagonistic defenses are present, stating that "[m]utually antagonistic defenses are not prejudicial *per se*." 506 U.S. at 538. Hence establishing an abuse of discretion requires "more than 'the presence of some hostility' among codefendants, and 'more than the fact that co-defendants whose strategies were generally antagonistic were tried together.'" *Gilliam*, 167 F.3d at 635 (quoting *United States v. (James) Brown*, 16 F.3d 423, 433 (D.C. Cir. 1994)).

We question whether Franklin's admissions through counsel actually constitute a "defense" that was irreconcilable with the defenses offered by the other defendants. Unlike a typical situation in which one defendant attempts to shift blame to another defendant, Franklin's admissions through counsel did not name any of the other defendants, identify specific counts, or describe the particular conduct that occurred. But even assuming *arguendo* that mutually antagonistic defenses were present, the district court adequately addressed any resulting prejudice by giving an appropriate limiting instruction. That instruction closely tracked the instruction the Supreme Court found sufficient to cure any prejudice arising from the mutually antagonistic defenses present in *Zafiro*. 506 U.S. at 540–41.

The appellants also assert that Franklin's admissions created an issue analogous to that the Supreme Court addressed in *Bruton v. United States*, 391 U.S. 123 (1968). *Bruton* concerned

a joint trial in which a nontestifying defendant's out-of-court confession was admitted into evidence and both defendants were subsequently convicted. The Court held that admitting one defendant's confession without giving the other defendant the opportunity to cross-examine him violated the Confrontation Clause of the Sixth Amendment. It reasoned that there was a "substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt." *Id.* at 126. *Bruton* and its progeny, *Richardson v. Marsh*, 481 U.S. 200 (1987), and *Gray v. Maryland*, 523 U.S. 185 (1998), all involved the admission of incriminating out-of-court statements made by a nontestifying codefendant.

The appellants have no *Bruton* claim, however, because Franklin's concessions through counsel do not implicate the Confrontation Clause. The Confrontation Clause prohibits "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Davis v. Washington*, 547 U.S. 813, 821 (2006) (quoting *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004)). The opening statement and closing argument made by Franklin's counsel, however, neither were admitted into evidence nor were they testimony. Indeed, although the appellants rely on *Bruton*, they have not identified any incriminating out-of-court statement made by Franklin that was admitted into evidence. In addition, the admissions Franklin made through counsel were not facially incriminating like the confession in *Bruton*, nor did they "refer[] directly to the 'existence' of the nonconfessing defendant" as in *Gray*, 523 U.S. at 192. Thus we conclude that the appellants' Sixth Amendment rights were not compromised.

Finally, even if Franklin's admissions through counsel created some prejudice, the district court was not obligated to

grant severance. "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro*, 506 U.S. at 538–39. Here, the court considered and responded to the objections from the other defense attorneys. It directed Franklin's counsel to limit the scope and content of the admissions and required that he explain that the admissions did not incriminate the other defendants. Moreover, the court gave several limiting instructions to the jury concerning how it should consider the admissions. These instructions helped mitigate any potential prejudice arising from the admissions.

The appellants have not shown that Franklin's admissions through counsel caused sufficient prejudice to necessitate severance. To the extent Franklin's admissions through counsel were an antagonistic defense, the court adequately responded by giving the curative instruction approved in *Zafiro*. Likewise, the appellants do not have a *Bruton* claim because no testimonial statement by Franklin was ever admitted into evidence. Thus the appellants have not shown that there was a "serious risk" that trying them with Franklin would "compromise a specific trial right" or "prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. The district court was in the best position to evaluate whether allowing Franklin's admissions through counsel would prejudice the other defendants' right to a fair trial. Having examined the record, we hold that the district court did not abuse its discretion when it denied the appellants' motions for severance.

B

Wilson contends that the district court should have granted his motion to sever because there was a great disparity between the evidence against him and the evidence against Franklin. As he correctly notes, we have previously stated that "[w]hen the

evidence against one or more defendants is 'far more damaging' than the evidence against another defendant, 'the prejudicial spillover may have deprived a defendant of a fair trial.'" *United States v. Manner*, 887 F.2d 317, 324 (D.C. Cir. 1989) (quoting *United States v. Tarantino*, 846 F.2d 1384, 1398 (D.C. Cir. 1988)). Nevertheless, Wilson has not identified any disparity that could have deprived him of a fair trial. On the contrary, as we have detailed in Part I.A, there was overwhelming evidence to support his conviction. *See also infra* Part XII. Thus the district court did not abuse its discretion in denying his motion for severance.

IV

Appellants next challenge the jury instructions on the RICO counts. Section 1962(c) of Title 18 makes it "unlawful" to "conduct or participate, directly or indirectly, in the conduct of [a qualifying] enterprise's affairs through a pattern of racketeering activity." Section 1962(d) prohibits conspiracy to violate other RICO provisions, including § 1962(c). Appellants were all convicted under RICO's conspiracy provision. Judgment of Franklin at 2; Judgment of Blackson at 2; Judgment of Robinson at 2; Judgment of Simmons at 2; Judgment of Wilson at 2. Appellants challenge the court's RICO jury instructions on three grounds. They contend that the district court's instructions failed to: (1) make clear that, to be convicted under § 1962(d), a defendant must participate in the operation or management of the enterprise; (2) adequately define an "enterprise" as requiring a structure apart from a pattern of racketeering activity; and (3) require "continuity" as a necessary element of a pattern of racketeering activity. We reject all three challenges.

44

A

First, appellants contend that the district court failed to instruct the jury that, to be convicted under § 1962(d), a defendant must participate in the operation or management of the enterprise. We review *de novo* the failure of the district court to provide a requested jury instruction. *United States v. Hurt*, 527 F.3d 1347, 1351 (D.C. Cir. 2008). The pertinent question is "whether, taken as a whole, [the instructions] accurately state the governing law and provide the jury with sufficient understanding of the issues and applicable standards." *United States v. Washington*, 106 F.3d 983, 1002 (D.C. Cir. 1997). Because the jury instructions given by the district court accurately reflect the current state of the law on the degree to which operation or management of the criminal enterprise is required for conviction of RICO conspiracy, we hold that the district court's jury instructions did not err in this respect.

According to the district court's jury instructions, in order to find guilt for RICO conspiracy under § 1962(d), the jury was required to find beyond a reasonable doubt: (1) that an enterprise — in this case, an illegal association in fact — existed; (2) that the enterprise engaged in or affected interstate commerce; (3) that each defendant knowingly and intentionally agreed with another person to conduct or participate in the affairs of the enterprise; and (4) that each defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts. May 17, 2006 PM Trial Tr. at 28–29. The district court subsequently elaborated on the third element, stating "the government does not have to prove that each defendant maintained a formal position in the enterprise or that each defendant was part of upper management. It is enough if the government proves beyond a reasonable doubt that the defendant, even if he is a lower rung participant agreed

to participate in an enterprise that one or more of the defendants would manage or operate." *Id.* at 32.

Appellants contend that the district court erred to the extent that it did not instruct the jury that it must find that each defendant managed or operated the enterprise. They rely primarily on *Reves v. Ernst & Young*, in which the Supreme Court held that RICO liability under 18 U.S.C. § 1962(c), RICO's prohibition on participation in a racketeering enterprise, does not extend "beyond those who participate in the operation or management of an enterprise through a pattern of racketeering activity." 507 U.S. 170, 184 (1993). Appellants claim that if a similar requirement is not extended to § 1962(d), prosecutors will be able to "get around *Reves*' limitation on RICO liability through the simple expedient of charging the defendants under § 1962(d), RICO's conspiracy provision, rather than under § 1962(c)," thereby "eviscerating" *Reves*. Appellants' Br. at 75, 77.

This court has previously declined to decide whether *Reves*' operation or management test is applicable to prosecutions under § 1962(d). *See United States v. Thomas*, 114 F.3d 228, 243 (D.C. Cir. 1997). Since *Thomas*, however, the Supreme Court has decided *Salinas v. United States*, 522 U.S. 52 (1997). In that case, the Court held that a § 1962(d) "conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Id.* at 63. Moreover, a "conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Id.* at 65. *Salinas* thus indicates that an individual defendant need not himself participate in the operation or management of an enterprise in order to be liable for conspiracy under § 1962(d).

Following *Salinas*, every court of appeals to consider the question has held that the *Reves* operation or management test does not apply to conspiracy under § 1962(d). *See United States v. Fernandez*, 388 F.3d 1199, 1230 (9th Cir. 2004); *Smith v. Berg*, 247 F.3d 532, 537–38 (3d Cir. 2001); *United States v. Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000); *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir. 2000); *United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998).

Moreover, contrary to appellants' contention, the Supreme Court's recent decision in *Boyle v. United States*, 129 S. Ct. 2237 (2009), does not alter this understanding of § 1962(d). *Boyle* addressed § 1962(c), not § 1962(d). To be sure, appellants are correct that the Court in *Boyle* stated that *Reves* "turned on our interpretation of the participation requirement of § 1962," rather than of § 1962(c) specifically. *Boyle*, 129 S. Ct. at 2243 n.3. However, § 1962(c) is the only subsection of § 1962 to explicitly include the sort of participation requirement discussed in *Reves*. Therefore, *Boyle*'s footnote necessarily references the provision discussed in *Reves* itself — § 1962(c).

The district court was thus correct to refuse appellants' proposed instruction requiring the jury to find that each defendant participated in the enterprise's management or operation.

We also reject Simmons' argument that he is differently situated from the other appellants. Simmons contends that because he had no role in the management or operation of the enterprise, he could not be convicted under § 1962(c), and so should not be liable under § 1962(d). He argues that it was impossible for him to conspire to violate a law that does not apply to him. This contention — that a defendant must be eligible for conviction under § 1962(c) to be convicted under § 1962(d) — is also foreclosed by *Salinas*. There, the Supreme

Court squarely held that an individual "may be liable for conspiracy even though he was incapable of committing the substantive offense." 522 U.S. at 64. Therefore, for Simmons as for all of the appellants, the district court's instructions were not in error.

B

In their opening brief, appellants also challenge the jury instructions on the ground that an association-in-fact enterprise must have some structure beyond the attendant pattern of racketeering activity.

Appellants' contention is without merit. In *Boyle*, the Supreme Court dismissed the notion that "the existence of an enterprise may never be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering" as "incorrect." 129 S. Ct. at 2245. Rather, it held that "the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise may in particular cases coalesce." *Id.* (internal quotation marks omitted).

C

Finally, appellants contend that the RICO jury instructions were flawed because the district court failed to instruct the jury that a pattern of racketeering must include an element of continuity. They acknowledge, however, that they did not raise this objection in the district court. Appellants' Br. at 70. As such, we review the absence of such an instruction only for plain error. *See* FED. R. CRIM. P. 52(b); *United States v. Wheeler*, 525 F.3d 1254, 1256 (D.C. Cir. 2008).

Assuming *arguendo* that the district court erred in this unobjected-to instruction, an appellant seeking to show plain error must still demonstrate that the district court's error affected substantial rights and seriously affected "the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 736 (1993) (internal quotation marks omitted). Appellants cannot meet that burden.

As this court has held, continuity as a required element of a pattern of racketeering activity "may be proved by establishing either a closed period of repeated conduct or a threat of future criminal activity." *W. Assocs. Ltd. P'ship ex rel. Ave. Assocs. Ltd. P'ship v. Mkt. Square Assocs.*, 235 F.3d 629, 633 (D.C. Cir. 2001) (internal quotation marks omitted). A closed period of repeated conduct, in turn, may be proven through "a series of related predicates extending over a substantial period of time." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242 (1989). A threat of future criminal activity may be proved by, for example, "past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241.

Here, the evidence showed both a closed period of repeated conduct and a threat of future criminal activity. Appellants were convicted of substantive drug distribution in a course of dealing spanning the time period from November 21, 2002 (Count 6, Indict. at 39; Judgment of Blackson at 2) to March 16, 2004 (Counts 77–78, Indict. at 47; Judgment of Franklin at 2). Therefore, the predicates for appellants' RICO conspiracy spanned a substantial period of time. Furthermore, the evidence presented at trial pointed to the likelihood of the criminal activity continuing. Indeed, Franklin was recorded stating, "Nothing will stop this money train!" Oct. 1, 2003 Wiretap Tr. at 1.

In light of the evidence at trial, appellants cannot show that omission of a continuity instruction was plain error.

49

V

Simmons asserts that reversible error occurred when the prosecutor "vouched" for the credibility of an important witness, his counsel promptly objected, and the court did nothing to remedy the improper vouching. The witness, Roberta Moore, testified for the prosecution pursuant to a plea agreement. Apr. 19, 2006 PM Trial Tr. at 9–12. On cross-examination, Simmons' counsel used the plea agreement to attack her credibility, stating, "Now in effect, based on this 10, 11 page plea agreement the government is pulling the strings today, right?" Apr. 20, 2006 AM Trial Tr. at 40. The prosecution objected, and the court sustained its objection. After establishing that Moore would be sentenced to at least five years' imprisonment unless the government filed a motion supporting a lower sentence, Simmons' counsel continued, "So you have to keep them happy so that they'll file those motions, right?" *Id.* at 55. Again the prosecution objected. Again the court sustained the objection. Addressing Moore's obligation to testify truthfully, Simmons' counsel asked, "Basically in your situation you tell the truth when it helps you, right?" *Id.* at 62. He later asked, "And you know the reason you haven't been sentenced yet is because since the government has so much control over you they want to sit here and [] see how you perform, right?" *Id.* at 72. On redirect, the prosecutor walked Moore through the details of the plea agreement again, highlighting the fact that the government's recommendation would not bind the judge at sentencing. Referring to the judge, the prosecutor then asked, "What do you think she'd do if you lied?" *Id.* at 88. Moore responded, "I'd be locked up." *Id.* Simmons' counsel interjected, "Objection, Your Honor," but the court overruled his objection, stating, "I think it was an appropriate redirect." *Id.*

On appeal, Simmons argues that this exchange constituted improper prosecutorial vouching because it implied that the prosecution and the court could monitor and verify whether Moore testified truthfully. A prosecutor may not vouch for the credibility of a witness. "[I]t is for the jury, and not the prosecutor, to say which witnesses are telling the truth." *United States v. (Xavier) Brown*, 508 F.3d 1066, 1075 (D.C. Cir. 2007) (quoting *Harris v. United States*, 402 F.2d 656, 658 (D.C. Cir. 1968)) (internal brackets omitted). When a prosecutor vouches for a witness' credibility, it may "convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant," thereby jeopardizing "the defendant's right to be tried solely on the basis of the evidence presented to the jury." *Id.* (quoting *United States v. Young*, 470 U.S. 1, 18 (1985)). Likewise, prosecutorial vouching "carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Id.* (quoting *Young*, 470 U.S. at 18–19) (emphasis omitted).

Our standard of review depends on whether the vouching objection was properly preserved. Federal Rule of Evidence 103 states that to preserve an issue concerning the admission of evidence, a party must make "a timely objection or motion to strike . . . stating the specific ground of objection, if the specific ground was not apparent from the context." FED. R. EVID. 103(a)(1). For nonevidentiary issues, Federal Rule of Criminal Procedure 51 requires that the objecting party inform the court of its objection "and the grounds for that objection." FED. R. CRIM. P. 51(b). In this case, Simmons' counsel objected in a timely manner, but did not state his ground for objecting, much less do so with specificity. When "the defendant fails to object or to state the specific ground for an overruled objection, we may reverse only for plain error unless the defendant can demonstrate on appeal that the ground for the objection was obvious from the

context in which it was made." *United States v. Boyd*, 54 F.3d 868, 872 (D.C. Cir. 1995). In *Boyd*, the prosecutor asked the defendant why two police eyewitnesses were "making this up." The defendant's counsel stated, "I object," and the judge replied, "Overruled." *Id.* at 870. The court reviewed this exchange only for plain error because "nothing in the context of defense counsel's unexplained objection made obvious the ground therefor." *Id.* at 872.

In this case, as in *Boyd*, the defendant's basis for his unexplained objection is not clear from the context. Moreover, nothing about the court's response indicates that it understood that Simmons' objection concerned vouching. We thus conclude that the plain error standard governs. To demonstrate plain error, an appellant must show "(1) a legal error that was (2) 'plain' (a term that is synonymous with 'clear' or 'obvious'), and that (3) affected [his] substantial rights." *(Xavier) Brown*, 508 F.3d at 1071 (quoting *United States v. Sullivan*, 451 F.3d 884, 892 (D.C. Cir. 2006)); *see also United States v. Olano*, 507 U.S. 725, 732–34 (1993). Even when a plain error has been shown, we will reverse only "if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *(Xavier) Brown*, 508 F.3d at 1071 (quoting *Sullivan*, 451 F.3d at 892–93). The appellant bears the burden of proving each element under this standard. *Id.*

In reviewing for plain error, the threshold question is whether there was a legal error. Therefore we must first determine whether the prosecutor's question constituted improper vouching. Given the context, we conclude this exchange was not plainly improper vouching, if it was vouching at all. Simmons would have us interpret the prosecutor's question to imply that the court could monitor and verify the truthfulness of Moore's testimony: "What do you think she'd do if you lied [and she would know if you did]?" But the question

could also be interpreted as "What do you think she'd do if you lied [assuming she knew you were lying]?" These possible interpretations show that the question does not necessarily imply that the judge would have known if Moore was lying. In addition, the prosecutor's question made sense in the context of the preceding cross-examination. On cross, Simmons' counsel questioned whether Moore was telling the truth, thereby putting her state of mind in question. The prosecutor's question on redirect also focused on Moore's state of mind, asking "What *do you think* she'd do if you lied?" Apr. 20, 2006 AM Trial Tr. at 88 (emphasis added). Thus the question focused on Moore's understanding of the plea agreement and her state of mind in testifying. Moreover, unlike the vouching in the cases upon which Simmons relies, it did not express the prosecutor's personal opinion about Moore's credibility. We conclude that this was hardly vouching, but was in fact a proper rejoinder to the cross-examination concerning the motive of the witness. This was not plain error, if it was error at all.

Assuming *arguendo* that Simmons had preserved this issue and it was error, we are convinced that this alleged vouching was harmless. Even discounting Roberta Moore's testimony, the evidence against Simmons was extensive. Moreover, the alleged vouching was relatively innocuous, particularly given the preceding cross-examination. In short, Simmons cannot prevail on this issue.

VI

At trial, cooperating witness Michael Abney testified that William Simmons was John Franklin's "loyalest foot soldier," describing him as Franklin's "rescue puppet." May 2, 2006 AM Trial Tr. at 42–43. When asked to clarify what he meant by "rescue puppet," he explained that Franklin had rescued Simmons from a "life of destruction," which he characterized as

"[d]rug addiction, no place to live, that type of thing." *Id.* at 44–45. The prosecutor then said, "Now let's talk about Mike's lifestyle of destruction. What did you know about him?" Abney responded, "I known that he smoked crack, snort dope. He had a history of known to be a thief, robbing, killing and stuff." *Id.* at 45. Simmons' counsel objected and sought to have Abney's answer stricken, but the court denied his motion. Although it refused to strike the statement, the court suggested, "Why don't we speak about Mr. Simmons' drug use and limit [] the testimony to that." *Id.* at 45–46.

Simmons contends that the court's failure to strike Abney's answer constitutes reversible error because it was inadmissible character evidence and its prejudicial effect substantially outweighed its probative value. Federal Rule of Evidence 404(b) states: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ." FED. R. EVID. 404(b). In criminal cases, Rule 404(b) requires that the prosecution provide pretrial notice when it intends to introduce character evidence if the defendant has requested such notice. *Id.* We review the district court's Rule 404(b) decisions for abuse of discretion. *United States v. Long*, 328 F.3d 655, 660 (D.C. Cir. 2003). In doing so, we give "much deference" to the district court's decision. *Id.* (quoting *United States v. Cassell*, 292 F.3d 788, 792 (D.C. Cir. 2002)). We will sustain that decision "so long as the evidence is relevant under Rule 401 and is offered as proof of a matter other than the defendant's character or propensity to commit a crime." *Id.*

As a procedural matter, Simmons argues that the government failed to provide notice that it planned to introduce this evidence. Although Simmons asserts that he requested

notice, he offers no evidence to that effect. Moreover, it is not clear whether the government expected Abney to make this statement, or whether the statement came as a surprise, meaning that it had no ability to give notice. Therefore we lack sufficient information to evaluate Simmons' claim that he never received the notice he claims to have sought.

Turning to the statement itself, the government argues that it was admissible because it went to Simmons' motive for serving as Franklin's "runner." It reasons that Simmons decided to serve as Franklin's runner because Franklin saved him from a "life of destruction." The government notes that Simmons' counsel had already portrayed his client as a drug addict who would steal to get drug money and therefore could not have been a trusted member of the alleged drug conspiracy. Even accepting this argument, however, it is difficult to understand how Abney's statement about Simmons' "history . . . of robbing [and] killing" demonstrates this motive. Moreover, it is hard to see how this statement could have been admissible under Rule 403, which states that "relevant[] evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." FED. R. EVID. 403. Here, admitting evidence concerning Simmons' alleged history of killing risked substantial unfair prejudice while adding very little probative information concerning his destructive lifestyle, especially considering that Simmons' counsel had already disclosed information about Simmons' drug addiction and propensity to steal. Thus the court arguably should have stricken this statement from the record and given a limiting instruction to the jury.

Nonetheless, we conclude that considering the trial as a whole, the district court's failure to strike this statement or give a limiting instruction was harmless error. The question is whether this evidence affected Simmons' substantial rights, for "[a]ny error, defect, irregularity, or variance that does not affect

substantial rights must be disregarded." FED. R. CRIM. P. 52(a). In evaluating whether this was harmless error, we ask "what effect the error had or reasonably may be taken to have had upon the jury's decision." *Kotteakos v. United States*, 328 U.S. 750, 764 (1946). Specifically, we must determine whether "the error had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 776. An error is harmless if the guilty verdict was "surely unattributable to the error." *United States v. Baugham*, 449 F.3d 167, 176 (D.C. Cir. 2006) (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993)).

We conclude that Abney's statement about Simmons' "history of . . . robbing [and] killing" did not have a substantial effect on the jury's verdict. First, even if the jury accepted Abney's statement as true, the information it conveyed was not particularly germane to the conspiracy and drug distribution counts on which Simmons was ultimately convicted. The statement was most probative as evidence that Simmons had a propensity for violence, but the jury found Simmons not guilty of murder and all other violent crimes with which he was charged. Verdict at 37–39. This supports our conclusion that the evidence Simmons protests, which concerned robbing and killing, did not influence the jury's verdict. Second, the other evidence against Simmons was so extensive we see no realistic possibility that this single uncorroborated remark, made in passing by a particularly garrulous witness, had any meaningful effect on the jury's verdict. Third, even though the court refused to strike the statement, it did prospectively limit Abney's testimony to Simmons' history of drug abuse, thereby avoiding additional prejudice and suggesting that Abney's statement was not especially relevant. Evaluating Abney's statement in the context of the whole trial, then, we are convinced that the district court's failure to strike this statement was harmless error and does not merit reversal.

VII

At trial, William Robinson sought to introduce two defense witnesses whose personal experiences would enable them to interpret various taped phone calls the government had introduced into evidence. The first witness was a former drug dealer; the second was a resident of the 18th and M neighborhood. The district court denied the motion, ruling that neither witness had the particularized knowledge of the events in question required of lay witnesses.

Antawan Robinson, the court found, lacked the particularized knowledge to serve as a lay fact witness "because he doesn't live in the area, he hasn't lived in the area, he has never talked to the defendants . . . by the telephone." May 16, 2006 PM Trial Tr. at 47. The district court likewise ruled that the second witness, who had even less firsthand knowledge of the conspiracy, was an inappropriate lay fact witness.

On appeal, Robinson argues only that the district court erred by excluding Antawan Robinson as a lay witness. He initially asserted error with respect to the second witness, but then offered no argument in support of that witness' admission, thereby abandoning his argument with respect the second witness. *See Terry v. Reno*, 101 F.3d 1412, 1415 (D.C. Cir. 1996); FED. R. APP. P. 28(a)(9)(A). We review the district court's evidentiary ruling for abuse of discretion. *United States v. Whitmore*, 359 F.3d 609, 616 (D.C. Cir. 2004).

Federal Rule of Evidence 702 governs expert testimony. Expert witnesses may testify to matters of "scientific, technical, or other specialized knowledge." FED. R. EVID. 702. Lay testimony, by contrast, is governed by Rule 701. Unlike experts, lay witnesses must base their testimony on their experiential "perception" and not on "scientific, technical, or other

specialized knowledge within the scope of Rule 702." FED. R. EVID. 701(a), (c). This requirement ensures that lay testimony is "the product of reasoning processes familiar to the average person in everyday life." *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005). Moreover, it avoids the "risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." FED. R. EVID. 701 advisory committee's notes, 2000 amends.

A witness with firsthand experience of a particular drug operation may testify under Rule 701. *See United States v. Williams*, 212 F.3d 1305, 1309 (D.C. Cir. 2000). In the absence of firsthand experience, a witness with the requisite expertise may testify as an expert about the many aspects of drug operations falling outside the scope of lay knowledge. *See United States v. Boney*, 977 F.2d 624, 628 (D.C. Cir. 1992) ("operations of narcotics dealers" are "a suitable topic for expert testimony because they are not within the common knowledge of the average juror"). At issue here is whether a lay witness may testify about drug operations outside the scope of lay knowledge based on past personal experience with other, similar drug operations.

At least three Circuits have found that such witnesses may testify only when qualified as experts. *See United States v. Oriedo*, 498 F.3d 593, 603–04 (7th Cir. 2007); *Garcia*, 413 F.3d at 215–17; *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997). *But see United States v. Page*, 521 F.3d 101, 105 (1st Cir. 2008). We agree with those courts holding that an individual without personalized knowledge of a specific drug conspiracy may not testify about drug topics that are beyond the understanding of an average juror under Rule 701. Such a witness may be permitted to testify only as an expert under Rule 702.

For a witness to testify reliably about a matter outside the scope of typical lay knowledge, the witness' knowledge must come from one of two sources: the firsthand experience of a lay witness, FED. R. EVID. 701, or the sort of "knowledge, skill, experience, training, or education" that would qualify the witness as an expert, FED. R. EVID. 702. Thus, if a witness lacks firsthand knowledge of a matter outside the scope of lay expertise, he may testify only if qualified as an expert. To hold otherwise would conflate the "particularized" knowledge necessary to testify as a lay witness with the "specialized" personal knowledge gained from previous experience that allows a witness to testify as an expert. An individual testifying about the operations of a drug conspiracy because of knowledge of that drug conspiracy has "particularized" knowledge and should be admitted as a lay witness; an individual testifying about the operations of a drug conspiracy based on previous experiences with other drug conspiracies has "specialized" knowledge and — provided his testimony meets the rule's enumerated requirements — should be admitted as an expert.

Antawan Robinson's proposed testimony falls squarely into the category of expert testimony. Robinson proposed to testify about terminology used in drug operations, a matter outside the scope of a typical lay person's knowledge and experience. Robinson had no firsthand experience with the M Street Crew; his testimony was to have been based entirely on his own experience as a drug dealer elsewhere. Such evidence is admissible only under Rule 702. Had the defense wished to introduce Robinson's testimony, it could have done so only by attempting to qualify him as an expert based on his experience of other drug operations.

We therefore affirm the district court's ruling not to allow Antawan Robinson to testify as a lay witness for the defense.

## VIII

On the morning of March 16, 2004, an FBI team entered the home of Nicole Harris to arrest her fiancé, George Wilson. The agents had an arrest warrant for Wilson, but had not yet obtained a search warrant for the residence. After arresting Wilson, they obtained written consent from Harris to search the premises. During their search, the agents discovered a 7.62mm assault rifle and approximately $80,000 in cash. Wilson filed a pretrial motion to suppress this evidence. After holding an evidentiary hearing, the district court ruled that the warrantless search did not violate the Fourth Amendment because it was conducted pursuant to valid consent. In the alternative, the court stated that even absent valid consent, the evidence would still be admissible under the inevitable discovery doctrine. Wilson appeals this ruling, arguing that there was no valid consent for the search and no probable cause upon which a warrant could have issued. In addition, he contends that the Supreme Court's decision in *Georgia v. Randolph*, 547 U.S. 103 (2006), entitles him to an evidentiary hearing concerning whether the agents intentionally deprived him of the opportunity to object to the search.

Valid consent constitutes an exception to the general Fourth Amendment requirement of a warrant supported by probable cause. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). To be valid, consent must be voluntarily given. Whether consent is voluntary depends on "the totality of all the surrounding circumstances." *Id.* at 226. In applying the "totality of the circumstances" test, a court may consider various factors, including the consenting party's "age, poor education or low intelligence, lack of advice concerning his constitutional rights, the length of any detention before consent was given, the repeated and prolonged nature of the questioning, and the use of physical punishment." *United States v. Hall*, 969 F.2d 1102, 1107 (D.C. Cir. 1992) (quoting *United States v. Lloyd*, 868 F.2d

447, 451 (D.C. Cir. 1989)). Since this inquiry is factually intensive, we will reverse a district court's determination that consent was voluntary only for clear error. *United States v. Lewis*, 921 F.2d 1294, 1301 (D.C. Cir. 1990). In addition, we accord extra deference to the district court's determinations concerning witness credibility. *See Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 500 (1984).

At the evidentiary hearing, FBI team leader Kevin Ashby testified concerning the circumstances under which Harris gave consent. He testified that after arresting Wilson, he decided to seek her consent to search rather than waiting for a warrant. Jan. 5, 2006 Evid. Hg. at 44–45. Ashby spoke to Harris, who was not handcuffed, while she was sitting on her couch. *Id.* at 45. He read the consent form to Harris and explained that she could refuse to give consent, but also informed her that they were applying for a search warrant and would remain in her home until the warrant had been obtained. *Id.* at 45, 71. Harris initially refused to give consent, but after thinking about it for a few minutes, she signed the form. *Id.* at 45, 47.

Harris offered a somewhat different account of events. When the search took place, she was 33 years old and had gone to school through the twelfth grade. She testified that the FBI team burst into the upstairs bedroom where she and Wilson had been sleeping, ordered them onto the floor, and handcuffed them both. Harris, who was only wearing a "nighty," asked the officers to put more clothes on her. *Id.* at 111. Once she was clothed, the officers took her downstairs and sat her on the couch. *Id.* at 111–12. When she asked whether they had a search warrant, a male officer (presumably Ashby) told her that they did not yet have one, but that it was "sitting in front of the Judge." *Id.* at 114. The officer also told Harris that they would not leave her house until they had gotten a search warrant. *Id.* at 118. When she asked if she could make a phone call, the agents

told her no. *Id.* at 114. Harris testified that she remained handcuffed until just before she signed the consent form. *Id.* at 123. She stated that she did not sign the consent form voluntarily. When asked why she did sign it, she said, "I signed the form because I felt that I didn't have no other choice and they wouldn't allow me to make a phone call and I was scared." *Id.* at 120. On cross-examination, the prosecution used a picture that showed Harris wearing a shirt with her arms through the sleeves to impeach her repeated testimony that she was handcuffed while discussing the consent form and deciding whether to sign it. *Id.* at 136–37. In response, she admitted that she might have been mistaken about the handcuffs. *Id.* at 137. In addition, Harris admitted that she did not want the evidence seized from her home to be used in her fiancé's trial. *Id.* at 139–40.

The district court found that Harris was "only partly credible," finding that "[h]er testimony to the Court's observation was memorized and not really being drawn from her recollection of her prior experience." Jan. 9, 2006 Evid. Hg. at 119. The court surmised that the agents probably removed Harris' handcuffs while she was still upstairs, allowing her to get dressed before she was taken downstairs. *Id.* at 121. It found that although the sudden intrusion "undoubtedly startled and scared Ms. Harris at first . . . nothing in her evidence supports her statements that she continued to feel scared or pressured." *Id.* Hence the district court concluded that Harris' "consent was voluntary under the totality of the circumstances," specifically noting that she was in her "early thirties," that she was "an educated person," that she talked to Ashby for two to five minutes, that she admitted having been told that she did not have to agree to the search, and that she was not handcuffed or restrained from leaving the residence. *Id.* at 123.

On this record, we cannot say that the district court's determination that Harris gave voluntary consent was clearly

erroneous. Considering the totality of the circumstances, most factors point toward voluntariness. Harris was 33 years old and she had completed the twelfth grade. Although the raid itself must have been startling, the agents did not seek her consent to search until she was out of the handcuffs, had dressed, and was seated on the couch. Ashby read the consent form to her and made sure she understood that she could choose whether to sign it or not. Morever, she apparently weighed that decision for several minutes before signing. There was no evidence of any physical coercion, verbal threats, or other conduct that would have impinged on Harris' ability to make a voluntary decision. Wilson points to the agent's statement that the FBI team would not leave until they obtained a search warrant, arguing that it left Harris without a choice. Having found and arrested Wilson on the premises, however, it was not improper for the FBI to secure the premises while a search warrant was obtained. *See Segura v. United States*, 468 U.S. 796, 810 (1984). Consequently, we affirm the district court's decision denying Wilson's motion to suppress. Since there was valid consent, Wilson's contention that the FBI lacked sufficient probable cause to support a search warrant is irrelevant. Likewise, we need not address the court's alternate holding that the evidence would inevitably have been discovered.

We turn briefly to Wilson's argument concerning *Georgia v. Randolph*, which was decided after the search of Harris' residence. At trial, Wilson renewed his motion to suppress based on the recent decision in *Randolph*, but the court again denied it. In *Randolph*, the Supreme Court held that even given valid consent from one occupant, the express objection of a physically present co-occupant renders the search unreasonable with respect to that co-occupant. 547 U.S. at 106. *Randolph* also suggested that "evidence that the police have removed the potentially objecting tenant . . . for the sake of avoiding a possible objection" might invalidate a subsequent search with respect to

that tenant. *Id.* at 121–22. Seizing on this dicta, Wilson argues that we should remand for an evidentiary hearing to determine whether the FBI agents who arrested him intentionally deprived him of the opportunity to object to the search. We disagree. Nothing in the evidence supports the proposition that the agents arrested and removed him to mute his possible objections to the search. Moreover, as the district court noted, it strains credulity to think that the FBI somehow anticipated the *Randolph* decision and therefore whisked Wilson away to prevent him from objecting. Apr. 13, 2006 AM Trial Tr. at 76. For these reasons, we affirm the district court's decision denying Wilson's renewed motion to suppress.

IX

John Franklin was convicted of being the principal administrator, organizer, or leader of a Continuing Criminal Enterprise ("CCE") in violation of 21 U.S.C. § 848 (Count 3). Pursuant to § 848(b), he was sentenced to life imprisonment. Franklin challenges his conviction on the ground that there was insufficient evidence to support the finding that he "occupie[d] a position of organizer, a supervisory position, or any other position of management" with respect to "five or more other persons," necessary for conviction on this count. 21 U.S.C. § 848(c)(2)(A).

Upon reviewing the evidence in the light most favorable to the government, as we must, we conclude that a reasonable jury could have found the essential elements of the offense beyond a reasonable doubt. *See United States v. Washington*, 12 F.3d 1128, 1135–36 (D.C. Cir. 1994) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). There was sufficient evidence to show that Franklin managed Elizabeth Lee, Monica Bell, William Simmons, William Robinson, and various of his other "lieutenants" and "foot soldiers."

• **Elizabeth Lee.** Drug "packagers" can be considered "managees" under 21 U.S.C. § 848. *United States v. Williams-Davis*, 90 F.3d 490, 509 (D.C. Cir. 1996). Elizabeth Lee, who was Franklin's common-law wife, testified regarding the drug packaging activities she pursued on Franklin's behalf. *See, e.g.*, Mar. 22, 2006 PM Trial Tr. at 7: "Well, I would get up, like I said, when the kids went off to school, and I would get the half an ounce bottles and the ounce bottles, put everything on the dresser, measuring cups and everything, measure it out and put it in the half an ounce bottles and the ounce bottles, wipe everything down, and put them in a suitcase. So when [Franklin] come in all he had to do was just grab it and go ahead back out." Other evidence showed Franklin "directed" Lee's drug packaging. *United States v. Mitchell*, 49 F.3d 769, 773 (D.C. Cir. 1995). For example, Lee testified that Franklin would sometimes "call [her] from the street" to direct her packaging activities. Mar. 22, 2006 PM Trial Tr. at 11; *see also id.* at 11, 12: "Q. And what kind of questions would he be asking you? A. What I bottle up, or [Franklin]'ll ask for a certain amount, have a certain amount done for him so he could come in and pick it up. Q. Did he ever ask you to count — tell him how much money he had available and that kind of thing? A. Yes."; "If he wanted a specific amount done, sometimes he would call back and tell me make sure you have such-and-such full ounces and half ounces."

Thus, the jury could reasonably have found beyond a reasonable doubt that Franklin managed the packaging activities of Elizabeth Lee.

• **Monica Bell.** Similarly, the evidence showed that Monica Bell, who served as a "tester" of Franklin's PCP, was under Franklin's direction. Bell testified that, "[a]bout three times a week," Franklin would "call" her and then "come by." Apr. 18, 2006 PM Trial Tr. at 82. At that point, Franklin would ask Bell "to test [a] dipper[] for him," and Bell would "[t]est PCP

laced dippers, cigarettes" "[f]or John." *Id.* at 78, 77. In exchange, Bell "might have got a dipper if [she] wanted one." *Id.* at 86. That Bell was directed by Franklin is unmistakable. Indeed, Bell testified to her direction by Franklin: "Q. Okay. Where Mr. Franklin says, hey, listen, go out front and get a cigarette from somebody, anybody, who is he telling that to? A. Me. Q. And what does he want you to do? A. Go get a cigarette from somebody outside." *Id.* at 97. Additionally, Lee, Franklin's drug packager, testified to Franklin's direction of his testers: "Q. What were you guys talking about? A. A tester. Q. What's a tester? A. He take some [PCP] out in the bottle and have people to smoke it to test it." Mar. 22, 2006 PM Trial Tr. at 40. Moreover, the fact that Bell received compensation in the form of free "dippers" and performed such services as often as three times a week renders her similarly situated to the "regular drivers" found to be managees in *Mitchell*, 49 F.3d at 773, or the "runners, packagers, or transporters" found to be managees in *Williams-Davis*, 90 F.3d at 509.

Given the evidence that she performed a service for Franklin, at his bidding, for compensation, there was sufficient evidence for the jury reasonably to find beyond a reasonable doubt that Bell was managed by Franklin.

• **William Simmons.** Drug runners can be considered managees for purposes of 21 U.S.C. § 848. *See Williams-Davis*, 90 F.3d at 509. There was sufficient evidence from a variety of sources for a jury reasonably to find beyond a reasonable doubt that William "Mike" Simmons served as a drug runner for Franklin and was under Franklin's direction.

Michael Abney testified that Simmons was "John Franklin loyalest foot soldier." May 2, 2006 AM Trial Tr. at 42. Abney further testified that Simmons' drug sales were completely directed by Franklin: "Q. What if anything did, did Mike do for

John? A. Whatever he told him. Sell bottles to people. If John need, if John needed anything done, he'd do it. He was like his, I say he was like his rescue puppet." *Id.* at 43. Abney further testified that when he bought PCP for distribution from Franklin, Simmons retrieved and delivered the drugs to him. Finally, Abney testified that his experience was not unusual: "Q. Did you see Mike [Simmons] get water [i.e, PCP] for other people under those circumstances? A. Yes. Q. Can you tell us about that? A. He do it the same way he do me. People go to get it from John, give John the money, Mike go get the water." *Id.* at 52.

Monica Bell likewise testified that when she tested Franklin's PCP for him, Simmons often delivered the "dipper" for her to test. Undercover officer Leftridge testified that on three occasions, after she purchased PCP from Franklin, another man — whom she later identified as Simmons — delivered the drugs to her. Her testimony was supported by videotape of two of those occasions. Finally, supporting evidence was presented by other cooperating government witnesses, who described Simmons as Franklin's "[s]idekick," or "running partner," Apr. 19, 2006 PM Trial Tr. at 44 (Roberta Moore), and his "runner," "flunky," "little man," or "helper," Apr. 27, 2006 AM Trial Tr. at 88 (Omari Minnis). These witnesses also testified to firsthand experience of Simmons "running" for Franklin.

• **William Robinson.** According to Michael Abney, Robinson was one of Franklin's "lieutenants." Although Abney's definition of a "lieutenant" may not correspond to that previously accepted by the court in *United States v. Thomas*, 114 F.3d 228, 259 (D.C. Cir. 1997), there was sufficient evidence for the jury reasonably to find beyond a reasonable doubt that Franklin managed Robinson. First, in several instances, the law-enforcement task force recorded conversations in which Franklin directed Robinson either to make a sale or to assist Franklin in a sale. Second, undercover officer Leftridge testified similarly,

describing how during one of her buys from Franklin, he had Robinson deliver the PCP she had purchased. Leftridge's testimony is corroborated by a surveillance video on which Robinson's face is visible as he delivers the PCP. Third, on at least one occasion, Franklin instructed Robinson to find someone to "taste" his PCP to ensure its quality.

• **Foot Soldiers.** Michael Abney classified himself and at least 16 other members of the M Street Crew as "foot soldiers." However, while "foot soldier" evokes the bottom rung of a military-like hierarchy, Abney's use of the term during his trial testimony did not deal solely with position in the chain of command. Instead, at various times he used the term "foot soldier" to indicate that his sales activity was less lucrative than that of "lieutenants," that he lacked his own source of drugs, or that his status among his peers was lower. As such, Abney's division of the members of the M Street Crew into "foot soldiers" and "lieutenants" is not dispositive evidence that Franklin managed either group.

Other evidence, however, shows that Franklin managed his "foot soldiers." For example, both Abney and another "foot soldier," Omari Minnis, described the M Street Crew's rotational system, whereby the "foot soldiers" would take turns selling drugs to customers. Minnis testified that the street sellers "took turns" in order to ensure there was "enough [business] to go around." Apr. 27, 2006 AM Trial Tr. at 79. Abney observed that the rotation system would "[k]eep a lot of hostility down." May 2, 2006 AM Trial Tr. at 98. Minnis also testified that the system was widely followed. Although Abney testified he was the only "foot soldier" not to follow the rotation system, he identified "John [Franklin] and the lieutenants" as the ones who imposed it. *Id.* at 97–98. Additionally, Tracy Ambers testified that she originally bought PCP from someone named "Ron," but Franklin

directed Ron to give Ambers Franklin's telephone number so that she could deal exclusively with Franklin in the future.

From this evidence the jury could reasonably credit Abney's description of Franklin imposing a selling regime on his "foot soldiers" and Ambers' recollection of Franklin directing "Ron" to give her Franklin's number. Franklin acknowledges that an individual exercises managerial responsibility by "maintaining control over drugs and customers by setting resale prices or determining to whom the drugs could be sold." Appellants' Br. at 122 (citing *Mitchell*, 49 F.3d at 772). Establishing when and by whom drugs can be sold is analogous. Thus, based on Abney's and Ambers' testimony, the jury could reasonably have found beyond a reasonable doubt that Franklin exercised managerial control over his "foot soldiers" and therefore fell within the purview of 21 U.S.C. § 848.

 • **Lieutenants George Wilson and Joseph Blackson.** Along with William Robinson, Michael Abney classified George Wilson and Joseph Blackson as Franklin's "lieutenants." "Lieutenants" are generally managees of the "general" of a crew for the purpose of 21 U.S.C. § 848. *See Williams-Davis*, 90 F.3d at 509. However, as noted, Abney's understanding of the term "lieutenant" renders his classification insufficient to establish that Franklin managed Wilson and Blackson. Abney's view of what it meant to be a "lieutenant" fluctuated during his testimony. In describing the roles of Wilson and Blackson, Abney portrayed a "lieutenant" as a manager, but, in later testimony, he described a "lieutenant" as a more successful drug dealer who was also, to some degree, a supplier. Status as a successful drug supplier does not render a person managed by Franklin. S*ee Mitchell*, 49 F.3d at 772.

However, Abney's classification of "lieutenants" does not stand alone. Other aspects of his testimony indicate that Franklin

was in a managerial position, at least with respect to Wilson. For example, Abney described a scuffle between himself and Wilson over whether to give a discount to a regular customer. Franklin stepped in, siding with Abney, and directed Wilson to stop bullying Abney — a directive Wilson apparently obeyed. Additionally, a wiretapped conversation between Franklin and Wilson revealed that Wilson considered himself to be managed by Franklin. As such, he asked Franklin on one occasion whether Franklin would like him to kill someone (an offer that Franklin refused): "Sugg [i.e. Wilson]: Want me to put somebody head on a slab. John: Huh? Sugg: Want me to show, want me to show my loyalty? John: Naw everything alright." Sept. 27, 2003 Wiretap Tr. at 1–2. Thus the jury could reasonably find beyond a reasonable doubt that Franklin managed at least Wilson and, perhaps — based upon Abney's testimony — Blackson as well. In any event, Wilson plus Lee, Bell, Simmons, Robinson, and the "foot soldiers" brings the total number of people that a reasonable jury could find were managed by Franklin well beyond five. Franklin's challenge to the sufficiency of the evidence on Count 3 thus fails.

X

Count 31 charged Blackson with distribution of PCP on April 15, 2003. Near the end of the trial, on May 16, 2006, Blackson filed a Renewed Motion for Severance and Motion for Judgment of Acquittal asserting, in part, that the government had dismissed Count 31 by presenting no evidence. The government acknowledged that it had offered no evidence on Count 31. Count 31 did not appear on the verdict form submitted to the jury, although the record does not indicate that the district court formally dismissed the count.

Nonetheless, the district court judgment states that the jury found Blackson guilty on Count 31, and imposes a sentence of

360 months' imprisonment, based in part on that count. The government acknowledges that this was in error, and we hold the error is plain. *See United States v. Olano*, 507 U.S. 725, 732–37 (1993); *United States v. Saro*, 24 F.3d 283, 286–88 (D.C. Cir. 1994). Because the error may have affected Blackson's sentence, the error affects substantial rights, and permitting the error to go uncorrected would seriously affect the integrity of judicial proceedings. We therefore reverse Blackson's conviction on Count 31 and remand for resentencing.

XI

Simmons was convicted of conspiring to distribute one or more kilograms of PCP, of conspiring to distribute ecstasy, of RICO conspiracy, and of three counts of distribution of PCP. At sentencing, the government argued that Simmons' base offense level under the Sentencing Guidelines should be 38 because he actually knew or could reasonably foresee that the conspiracy would involve more than 30 kilograms of PCP. Simmons argued that 32 was the appropriate base level because he was only convicted of a conspiracy involving one or more kilograms. The district court agreed his base offense level was 32 and imposed a two-level increase for the use of firearms within the scope of the conspiracy, and a one-level increase based on the parties' stipulation that the drug sales occurred within 1,000 feet of a school. With this adjusted offense level of 35, combined with Simmons' Category II criminal history, the district court calculated a Guidelines range of 188 to 235 months.

The district court stated that although it was unable to find that Simmons could reasonably foresee the full 30 kilograms of PCP distributed by the M Street Crew, it was "not comfortable with 235 months either," and it would impose a prison sentence of 264 months, or 22 years. Aug. 24, 2006 Sent. Hg. at 46. To explain that sentence, the district court noted the jury's special

finding that the amount of PCP involved in the conspiracy exceeded 30 kilograms. Although that finding was associated with the CCE charge against Franklin only, the district court concluded it was "perfectly legitimate to use that [amount] in sentencing for other defendants to the extent it applies because the conduct underlying the narcotics conspiracy, the RICO conspiracy and the CCE count are all the same." *Id.* at 48.

Regarding the extent of Simmons' involvement in the conspiracy, the district court found that the evidence showed he "was on the street regularly with Mr. Franklin," "delivered testers to Monica Bell," "delivered [PCP] to Roberta Moore," and "handled PCP at M Street by being a runner for Mr. Franklin." *Id.* The district court also referenced the evidence describing Simmons as "a flunky," and found that "he would regularly retrieve PCP vials from Franklin's truck and bring [them] to M Street Crew members," that he could be seen "on the video cam[era] delivering [PCP] to the undercover officer [Leftridge]," and that "he stored 144 empty vials in his mother's house." *Id.* at 49. Nevertheless, the district court concluded that it could not find that Simmons knew or could reasonably foresee that the conspiracy involved the full 30 kilograms in view of evidence that he was not on the street every day, that "he's terribly, terribly addicted and would go off on binges on some unknown regularity," and that it was not clear exactly how often Simmons worked with Franklin. *Id.*

The district court turned to the sentencing factors in 18 U.S.C. § 3553(a). With regard to the nature and circumstances of the offense, the district court found that Simmons was a willing participant in a narcotics and RICO conspiracy. As to the history and characteristics of the defendant, the district court found that Simmons was addicted to drugs, suggesting a higher sentence. Regarding the seriousness of the offenses, the district court found that they were serious. Finally, as to the need for

adequate deterrence and to protect the public from further crimes, the district court found that Simmons' drug use made him a risk to commit future crimes. Aug. 24, 2006 Sent. Hg. at 51–52. Based on these findings, the district court concluded that a sentence within the Guidelines range would not be "just punishment" in view of Simmons' conduct, convictions, history, and characteristics, and sentenced Simmons to 264 months' imprisonment. *Id.* at 52. Upon inquiring of his counsel whether these were "the necessary findings," Simmons' counsel agreed they were, and also agreed later in the sentencing hearing that the district court had "addressed and resolved" all of Simmons' objections. *Id.* at 52, 54.

On appeal, Simmons contends his sentencing was procedurally unsound because the district court failed to give adequate reasons for imposing an above-Guidelines sentence, and the sentence was substantively unreasonable. Our review for both procedural soundness — including whether the district court considered the necessary factors and adequately explained a deviation from the Guidelines — and the substantive reasonableness of sentences is for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). Where a defendant failed to make a timely objection to the alleged procedural error in the district court, however, our review is for plain error. *In re Sealed Case*, 527 F.3d 188, 191–92 (D.C. Cir. 2008). If there was no procedural error, the court then considers whether the sentence was substantively reasonable, giving "due deference" to the district court's determination that the § 3553(a) factors, as a whole, justify the extent of the variance. *Gall*, 552 U.S. at 51. The court reviews the substantive reasonableness of a sentence under the abuse of discretion standard even when no objection was raised in the district court. *See United States v. Bras*, 483 F.3d 103, 113 (D.C. Cir. 2007).

A

Simmons contends that the district court failed to provide adequate reasons for imposing an above-Guidelines sentence. He does not contest the determination of his base offense level or the adjustments for guns and selling drugs within 1,000 feet of a school. Instead, he takes issue with the district court's reasons for imposing a sentence that was 29 months above the upper bound suggested by the Guidelines range. Maintaining that the district court gave only two justifications for this variance — the seriousness of the offense and his history of drug abuse — Simmons contends drug abuse is not an appropriate basis for imposing an above-Guidelines sentence because the Guidelines proscribe taking drug dependence or abuse into account. He cites § 5H1.4 of the Guidelines, which states that "[d]rug or alcohol dependence or abuse is not a reason for a downward departure," and various pre-*Booker* cases holding that drug history may not be a basis for a departure, but no case holding that drug history may not be a basis for an upward variance. Nevertheless, he maintains the same policy rationale supports both propositions, presumably that the Guidelines sentencing scheme encourages defendants to admit and seek treatment for their drug dependency. Appellants' Br. at 139; *see also id.* at 138 (citing *United States v. Luscier*, 983 F.2d 1507, 1510 (9th Cir. 1993)); *United States v. Richison*, 901 F.2d 778, 781 (9th Cir. 1990).

Because Simmons did not object in the district court, our review of his procedural challenge is for plain error, and we find none. The record shows the district court adequately explained its reasoning. In addition, although the district court did consider Simmons' history of drug abuse as one factor in its sentencing decision, the record does not support Simmons' claim that the district court "relied primarily" on that history of abuse in imposing an upward variance. Appellants' Br. at 137. The district court mentioned a number of other factors, especially the

extent of his involvement in the overall conspiracy. In any event, Simmons' reliance on Guidelines § 5H1.4 is misplaced because that provision refers only to *downward* departures based on drug abuse; indeed, he overlooks that § 5H1.4 states that "[s]ubstance abuse is highly correlated to an increased propensity to commit crime," suggesting drug abuse may be an appropriate reason for an increased sentence.

B

Simmons contends, for the first time in his reply brief, that the district court's sentencing process was unsound because the district court failed to provide him with a written statement of the reasons for the variance as required under 18 U.S.C. § 3553(c)(2). Simmons asserts the "Statement of Reasons" in the amended judgment and conviction order (filed on Sept. 8, 2006) was left blank as to the reasons for the upward variance. He relies on *In re Sealed Case*, where this court held it was plain error for the district court not to provide a written statement of reasons, stating that "[w]hen a district judge fails to provide a statement of reasons, as § 3553(c) requires, the sentence is imposed in violation of law," and "[t]he absence of a statement of reasons is prejudicial in itself because it precludes appellate review of the substantive reasonableness of the sentence." 527 F.3d at 191, 193. Accordingly Simmons contends, because this court is unable to determine the reasonableness of his sentence, a remand for resentencing is required.

This contention fails for at least two reasons. First, the contention is untimely because it is first raised in a reply brief. *See, e.g.*, *United States v. Berkeley*, 567 F.3d 703, 711 n.4 (D.C. Cir. 2009); *United States v. Johnson*, 216 F.3d 1162, 1168 (D.C. Cir. 2000). Second, the contention would be subject only to review for plain error because Simmons did not so object in the district court, and there is no error, much less plain error.

Although the complete judgment does not appear in the joint appendix filed by the parties and the "Statement of Reasons" was sealed in the district court, the complete judgment in fact includes a "Statement of Reasons" by the district court referencing its findings at the sentencing hearing.[7] Under the section titled "Advisory Guideline Sentencing Determination," the district court wrote: "Narcotics and RICO conspiracy of insufficient foreseeability of 30 kg but significantly more than 1–3 kg, offense of conviction: → See sentencing transcript." Statement of Reasons at 2. In the section titled "Departures Authorized by the Advisory Sentencing Guidelines," the district court indicated that the sentence was above the advisory Guideline range and listed the following "facts justifying the departure": "Aggravating: Clearly foreseeable of more than 1–3 kg but not full 30 of co-conspirators." *Id*. With the "Statement of Reasons" appended to the original judgment and commitment order, this court is able to conduct appellate review of the reasonableness of Simmons' sentence, including the variance, and a remand is unnecessary. *See In re Sealed Case*, 527 F.3d at 193. (Although the "Statement of Reasons" termed Simmons' increased sentence a "departure," the record makes clear the district court was imposing a variance. *Compare United States v. (Daniel) Brown*, 578 F.3d 221, 225–28 (3d Cir. 2009).)

C

Simmons contends his sentence was substantively unreasonable because his "sad personal history and characteristics, and his limited role in the offenses of conviction, would have supported a variance below the guideline range."

---

[7] The "Statement of Reasons" remains under seal except insofar as this opinion refers to information in the Statement. *See United States v. Reeves*, 586 F.3d 20, 22 n.1 (D.C. Cir. 2009); *United States v. Parnell*, 524 F.3d 166, 167 n.1 (2d Cir. 2008).

Appellants' Br. at 137–38. He points out that the government did not request the upward variance and emphasizes his minor role in the conspiracy: Unlike his co-conspirators, he did not make much money from the conspiracy, did not possess a firearm, and lived in poverty.

Simmons fails to demonstrate that his sentence was substantively unreasonable for several reasons. He acknowledges that the government advocated an initial base offense level of 38, not 32, and he cannot deny that the evidence of his participation in the conspiracy was substantial. The district court provided a reasoned explanation for Simmons' sentence based on the statutory factors. As is evident from a comparison of his sentence with the sentences imposed on the other appellants, the district court accounted for the level and significance of Simmons' participation in the conspiracy. *See United States v. Thomas*, 114 F.3d 228, 261–62 (D.C. Cir. 1997). And, in relying on considerations invoking sentencing discretion, Simmons points to no reason this court should not accord due deference to the district court's determination that the § 3553(a) factors justify a variance. *See Gall*, 552 U.S. at 51.

## XII

### A

William Robinson, George Wilson, and Joseph Blackson challenge the district court's calculation of their Guidelines ranges. They contend that the district court incorrectly attributed to each of them the distribution of 30 or more kilograms of PCP.

The district court properly could find that more than 30 kilograms of PCP were involved in the M Street Crew conspiracy. Pursuant to 21 U.S.C. § 848(b), the instructions regarding the continuing criminal enterprise charge against

Franklin (Count 3) required the jury to find that the CCE involved distributing at least 30 kilograms of PCP, and the jury so found. The only CCE predicate offense involving that amount of PCP was Count 1, narcotics conspiracy, of which all appellants were found guilty. Drugs distributed by a co-conspirator in furtherance of a conspiracy are attributable to a member of the conspiracy so long as the distribution was "reasonably foreseeable" to that member. *United States v. Childress*, 58 F.3d 693, 722 (D.C. Cir. 1995); U.S.S.G. § 1B1.3(a)(1)(B). Even if reasonably foreseeable, however, a member of a conspiracy is not necessarily accountable for a co-conspirator's "side deals" that are not in furtherance of the conspiracy. *United States v. Saro*, 24 F.3d 283, 288 (D.C. Cir. 1994).

Herbert Martin testified that he had supplied Franklin with "[a]t least about 15, 20 gallons" of PCP. Mar. 14, 2006 AM Trial Tr. at 65. Conservatively estimated, in accordance with the instructions to the jury, 15 gallons is 39 kilograms. There was evidence, however, that Franklin had sold 6 kilograms of PCP to Ceasar Harris independent of the M Street Crew conspiracy. Subtracting the 6 kilograms sold to Harris left 33 kilograms of PCP. During the course of the investigation, the law enforcement task force intercepted 6,916 of Franklin's telephone calls and there was no reference in the recorded conversations to outside sales other than to Harris. Robinson, Wilson, and Blackson do not claim, much less point to evidence of, any other side deals by Franklin. Neither do they contend the jury instructions failed to instruct on the scope of the conspiracy. Therefore, in the absence of evidence of other side deals, the district court's finding that the M Street Crew distributed more than 30 kilograms of PCP was not clearly erroneous. The question remains whether the 30 kilograms of PCP was reasonably foreseeable to Robinson, Wilson, and Blackson individually.

• **William Robinson.** During sentencing the district court made individualized findings that the M Street Crew sales were foreseeable by Robinson in their entirety. We find no clear error. The district court relied on the evidence that Robinson "was engaged in selling activities almost daily," that he "was the source of PCP when Franklin was otherwise not handy," and that he "had regular and constant communications with Mr. Franklin about the quantity of PCP on the street and who should get PCP from whom and to whom should he sell it to and that sort of thing." Sept. 6, 2006 Sent. Hg. at 53. These findings are supported by wiretaps and the testimony of Abney and undercover officer Leftridge.

• **George Wilson.** In finding Wilson could reasonably foresee the full extent of the PCP sold by the M Street Crew, the district court referred to Wilson's proximity to the day-to-day activities of the Crew ("Wilson was on the street at 18th and M Northeast daily"), his proximity to Franklin ("Wilson was in almost daily contact with Mr. Franklin"), and his role in directing sales (Wilson was "observant as to the actions of the crew and the members and engaged in sales" and reported his observations to Franklin). Aug. 17, 2006 Sent. Hg. at 37–38. These findings, too, are supported by wiretaps and Abney's testimony, and are not clearly erroneous.

• **Joseph Blackson.** Blackson was incarcerated following his arrest on July 29, 2003. The district court found that "Mr. Blackson had direct knowledge of the growth of the scope of the conspiracy," that his trafficking to Officer Leftridge was "part and parcel of the growth of that drug trafficking," and that "for a period of time he could certainly observe the level of sales by his co[-]conspirators." Aug. 31, 2006 Sent. Hg. at 66. The district court also found that Blackson never "withdrew from the conspiracy" and that he "immediately went back to trafficking" after his release, so that he knew or could reasonably

foresee the full amount of PCP sold by the M Street Crew, including that sold while he was incarcerated. *Id.* at 67. These findings are not clearly erroneous. Blackson concedes that his imprisonment in 2003 did not constitute a withdrawal from the conspiracy, and he does not challenge the district court's finding that he went back to selling drugs upon his release. Testimony from Ronnie Tucker, Abney, and undercover officer Leftridge supports the district court's finding that Blackson had sufficient involvement in the conspiracy to reasonably foresee the amount of PCP sold.

B

Wilson and Blackson also challenge the increase in their sentences under the Guidelines for having played a management or supervisory role with respect to the M Street Crew's distribution of PCP, ecstasy, and crack cocaine. *See* U.S.S.G. § 3B1.1(b). The Guidelines list a number of factors that a sentencing court should consider when deciding whether to apply an enhancement under § 3B1.1(b) for a defendant's role, including:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 App. Note 4; *see also United States v. Smith*, 374 F.3d 1240, 1249 (D.C. Cir. 2004). The court has held that "[a]ll persons receiving an enhancement [under § 3B1.1] must exercise some control over others." *United States v. Graham*,

162 F.3d 1180, 1185 (D.C. Cir. 1998). Because the evidence supports such a finding as to Wilson and Blackson, we affirm.

• **George Wilson.** The evidence relied upon by the district court at sentencing demonstrates both that a number of the relevant factors were present in Wilson's case and that the district court considered them in sentencing him. Abney's testimony, for example, indicates that Wilson exercised decision-making authority. Indeed, the district court cited Abney's testimony in stating that "Mr. Wilson directed others. Mr. Abney characterized Mr. Wilson, Mr. Robinson and Mr. Blackson as lieutenants as opposed to foot soldiers[, and] when Mr. Franklin was absent, the street sellers would go to the lieutenants when they needed advice." Aug. 17, 2006 Sent. Hg. at 42. Additional evidence relied upon by the district court shows Wilson directly planning or organizing: A wiretapped conversation revealed Wilson "talking of holding a gun to the man suspected of theft of the crew drugs that also shows taking charge in a way that the others did not." *Id.* at 43. The district court further found based on cooperating Crew-member testimony that Wilson had chased a non-Crew member from the street in order "to protect the sales for the organization." *Id.* at 42–43. And, based on other testimony, the district court found that Wilson was viewed as a leader by Crew members. *Id.* at 43.

These findings are supported by evidence showing that Wilson exercised "some control over others," *Graham*, 162 F.3d at 1185. For example, after classifying Wilson as a "lieutenant," Abney referred to "John [Franklin] and the lieutenants" as those "whose recommendation or whose suggestion [it] was that there be" a rotational system of drug selling. May 2, 2006 AM Trial Tr. at 16, 98. These "lieutenants" resolved altercations among the "foot soldiers" in Franklin's absence. Abney's view of Wilson as a supervisor is also supported by at least one wiretap recording on which Wilson was recorded telling Franklin that he

had admonished "foot soldier" Ronnie Tucker for "his failure to maintain sales the way he was suppose[d] to." Aug. 17, 2006 Sent. Hg. at 43. Given the district court's findings and the record evidence demonstrating his management or supervisory role, Wilson's contention that "the court did not take into account the totality of Abney's testimony" in sentencing him, Appellants' Br. at 150, is unpersuasive. *See Smith*, 374 F.3d at 1250.

> • **Joseph Blackson.** The district court made a similar finding regarding Joseph Blackson's role in the conspiracy. The district court found that Blackson was heavily involved in drug sales on M Street, as exemplified by his dealings with undercover officer Leftridge. He "was the one with whom Officer Leftridge made her initial connections," "he sold her wholesale quantities of drugs," and "he got the PCP that he sold from Mr. Franklin." Aug. 31, 2006 Sent. Hg. at 68. Blackson's own words to undercover officer Leftridge confirmed this: He told her "that he and his brother supply everyone on M Street," and that "he and his brother sold Ecstasy before PCP." *Id.* The district court also found that investigating officers initially thought Blackson was the Crew leader based on his "conduct and position," and that while in jail Blackson wanted to know what was happening to others who were still on the street. *Id.* at 68–69. Additionally, the district court found that some cooperating witnesses identified Blackson as a "lieutenant." *Id*. at 69. The district court concluded:

> > Proving that Mr. Blackson was a leader in other ways isn't really in the record. But I think what is in the record and the totality of the evidence is sufficient for the Court to find that with individual attention to Mr. Blackson that he was more of a supervisor/leader/manager type than the guys who were selling on the streets. They certainly viewed him in that way.

*Id.*

Although the district court's findings might have been clearer concerning whether Blackson exercised some control of others, they suffice. There was record evidence supporting the district court's finding that Blackson was a manager/supervisor. Most pertinently, Abney had named "John [Franklin] and the lieutenants" as suggesting the rotational system of drug selling. May 2, 2006 AM Trial Tr. at 98. According to Abney, these "lieutenants," including Blackson, resolved altercations among "foot soldiers" in Franklin's absence, *id.* at 13–15, and Ronnie Tucker testified Blackson sometimes held PCP for Franklin when he was not around, Apr. 24, 2006 PM Trial Tr. at 18. However, the district court did agree with Blackson that Abney's and Tucker's testimony was "somewhat disjointed and difficult to really pin down." Aug. 31, 2006 Sent. Hg. at 68. At times Abney seemed to confuse status as a "lieutenant" possessing command authority with either a dealer's separate drug connection, his financial success, or with his self-esteem. *See supra* Part IX. Also, Tucker appeared at one point to equate Blackson to Simmons, a "foot soldier"; this evidence might have tended to show that Blackson was at the bottom level of the conspiracy, which would not be sufficient to justify an enhancement under § 3B1.1(b), *Graham*, 162 F.3d at 1184.

But recognizing these problems, the district court could sort through the evidence, credit Abney's testimony that Blackson would settle altercations in Franklin's absence, and find that some "foot soldiers" viewed Blackson as having control over them. Abney's testimony supports the finding that Blackson exercised the requisite degree of "control over others," *Graham*, 162 F.3d at 1185. Likewise, Blackson's statements to Officer Leftridge that he and Franklin supplied everyone on M Street and that dealing with Franklin was the same as dealing with him both indicate a managerial role in the conspiracy. Moreover, the fact that the investigating officers initially thought Blackson was the Crew leader at least supports the conclusion that his role was that

of a manager/supervisor. According due deference to the district court's application of the Sentencing Guidelines to evidentiary findings, *United States v. Tann*, 532 F.3d 868, 874 (D.C. Cir. 2008), the district court had a sufficient basis to conclude that Blackson was a manager/supervisor.

\* \* \*

For the foregoing reasons, except for Blackson's judgment as to Count 31, we affirm the district court's judgments. We vacate Blackson's judgment on Count 31 and remand to the district court for further proceedings consistent with this opinion.

*So ordered.*